# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
SWR, Inc. ) ASBCA No. 56708
)
Under Contract No. W912CN-06-D-0013 )

APPEARANCES FOR THE APPELLANT: Karl Dix, Jr., Esq.
Douglas L. Tabeling, Esq.
  Smith, Currie & Hancock LLP
  Atlanta, GA

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
  Army Chief Trial Attorney
  MAJ K.L. Grace Moseley, JA
  CPT Edward Ahn, JA
  Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE HARTMAN

Appellant seeks over $3 million as a result of the Department of the Army's termination for convenience of its commercial items contract for services to receive, store, maintain and release vehicles located on the island of Oahu, Hawaii, owned by soldiers deployed to fight the global war on terror. The Army's contracting officer (CO) ordered work be stopped on the contract 20 days after award due to filing of a bid protest and subsequently terminated the contract before issuing any delivery orders for services.

## FINDINGS OF FACT

On 6 April 2006, the Army Contracting Agency at Fort Shafter, Hawaii, awarded to appellant, SWR, Inc. (SWR), a fixed-price, commercial-items requirements contract, No. W912CN-06-D-0013 (0013 Contract), to "furnish all management, supervision, labor, storage facilities, equipment, supplies, materials, and other required services to store privately owned vehicles (sports utility vehicles, pickup trucks, motorcycles and vans) for Army military members on the Island of Oahu, Hawaii, while deployed." The contract's statement of work (SOW) required SWR to "have an enclosed storage facility with four walls, concrete, asphalt, or hard packed gravel ground, roof, and fire protection/alarm system." (R4, tab 4 at 3, 5, 34-37, 42; tr. 2/93, 96, 117)

The contract was for a single base year of performance (1 June 2006 to 31 May 2007) with options for four subsequent years of performance. The base year and each

option year contained four contract line item numbers (CLINs) for payment: (AA) rental/lease of property; (AB) furnish warehouse space to store privately-owned vehicles (POVs); (AC) supplies, equipment and services necessary to receive, secure, inspect and release vehicles; and (AD) maintenance of stored POVs. (R4, tab 2 at 2, tab 4 at 14-31, 54) It was estimated SWR would be paid $215,314.63 per month for CLIN AA (lease of property) and $950.83 per 100 POV unit for CLIN AB (warehouse space) (R4, tab 4 at 16; tr. 1/65, 2/115).

Modification No. 1 to the contract stated 2,000 to 2,500 POVs were estimated to be stored. It indicated the contractor was not required to supply structures for 2,500 POVs immediately, but only the quantities specified in delivery orders issued. It provided:

> Delivery orders will be issued for vehicles in 100 vehicle "lots", as required. Contractor will invoice only for actual vehicles stored per vehicle per month against individual delivery orders issued. Contractor will receive 30 day notice of various deliveries of vehicles, vehicles are required to be under cover per SOW para. 1.1 within 30 days of receipt of delivery order.

(R4, tab 2 at 2; tr. 2/97, 99, 124, 130)

The contract contained standard Federal Acquisition Regulation (FAR) clauses 52.216-21, REQUIREMENTS (OCT 1995) and 52.216-18, ORDERING (OCT 1995). The former provided, in part:

> (a) This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract....

> (b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. Subject to any limitations in the Order Limitations clause or elsewhere in this contract, the Contractor shall furnish to the Government all supplies or services specified in the Schedule and called for by orders issued in accordance with the Ordering clause....

The latter provided in part:

> (a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or

2

task orders by the individuals or activities designated in the Schedule....

The contract also contained FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (OCT 2003), which provided in pertinent part:

> (i) Payment. -- (1) Items accepted. Payment shall be made for items accepted by the Government that have been delivered to the delivery destination set forth in this contract.

> ....

> (l) Termination for the Government's convenience. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. **Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination.** The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided. [Emphasis added]

(R4, tab 4 at 35-36)

Pursuant to 31 U.S.C. § 3553, 41 U.S.C. § 264 (recodified at 41 U.S.C. § 3307 (2011)), FAR 52.212-5, CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR EXECUTIVE ORDERS -- COMMERCIAL ITEMS (APR 2005), and FAR 12.301(b)(4), SOLICITATION PROVISIONS AND CONTRACT CLAUSES FOR THE ACQUISITION OF COMMERCIAL ITEMS (OCT 2005), the contract incorporated by reference FAR 52.233-3, PROTEST AFTER AWARD (AUG 1996), which provided:

3

(a) Upon receipt of a notice of protest (as defined in FAR 33.101) or a determination that a protest is likely (see FAR 33.102(d)), the Contracting Officer may, by written order to the Contractor, direct the Contractor to stop performance of the work called for by this contract. The order shall be specifically identified as a stop-work order issued under this clause. Upon receipt of the order, the Contractor shall immediately comply with its terms and take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage. Upon receipt of the final decision in the protest, the Contracting Officer shall either—

(1) Cancel the stop-work order; or

(2) Terminate the work covered by the order as provided in the Default, or the Termination for Convenience of the Government, clause of this contract.

(R4, tab 4 at 37)

The parties' contract included FAR 52.242-15, STOP-WORK ORDER (AUG 1989) and FAR 52.237-3, CONTINUITY OF SERVICES (JAN 1991). The former provided in part:

(a) The Contracting Officer may, at any time, by written order to the Contractor, require the Contractor to stop all, or any part, of the work called for by this contract for a period of 90 days after the order is delivered to the Contractor, and for any further period to which the parties may agree....

The latter provided in part:

(a) The Contractor recognizes that the services under this contract are vital to the Government and must be continued without interruption and that, upon contract expiration, a successor, either the Government or another contractor, may continue them. The Contractor agrees to (1) furnish phase-in training and (2) exercise its best efforts and cooperation to effect an orderly and efficient transition to a successor.

(R4, tab 4 at 46)

4

SWR was a HUBZone certified small business concern based in Alabama that employed 125 people and worked as a logistics support contractor for the Departments of the Army, Air Force, Navy, and Veterans Affairs and the Library of Congress. SWR previously performed contracts for the storage and maintenance of POVs of deployed service members at several sites, including Fort Wainwright in Alaska, Fort Campbell in Kentucky, and East Range, Schofield Barracks in Hawaii. (App. ex. 6, tab 20 at 336; R4, tab 26 at 830; tr. 1/89, 2/112)

SWR's one-year contract at East Range in 2004, required it to utilize tensioned fabric membrane structures made by Sprung Instant Structures, Inc., (Sprung) to store POVs because there generally is insufficient "warehouse space" available for lease on the Hawaiian island (tr. 1/113, 118-19, 143, 2/151; see R4, tab 53). While covered with fabric and sometimes called "tents," those engaging in their sale and installation prefer the term fabric or instant "structures" because they can be as large as a typical Wal-Mart store, and are comprised of large aluminum beams held together by braces, situated on base plates, and kept in place by pile-driven, duckbill, earth anchors similar to those utilized for telephone poles, the depth and size of which are determined by load requirements (tr. 1/112-13, 150-51, 3/190; see R4, tab 3 at 10-12; R4, tab 53; J. McGarry, Florida Exposition Services (FES) owner, deposition (dep.) at 81). For the East Range contract, SWR executed a 13-page, 12-month lease for five 70-foot by 230-foot fabric structures that allowed it to purchase those structures from Sprung upon conclusion of that lease with 90% of the rent payments applied to purchase price if all rent payments were timely received (R4, tab 53 at 1, 5). This lease required an upfront payment or deposit of $47,460 at the time of order of structures being manufactured and stated "[s]hould circumstances require Lessee to request that the Lease Agreement be terminated prior to shipment of the structures," and Lessor agreed to that request, "a charge of $75,767.00 per structure" would apply as a "restocking" fee. Consistent with Sprung's practice for both leases and sales, the parties' agreement provided Sprung would supply a "technical consultant" on site to assist with assembly and erection, and subsequent dismantling, of the fabric structures for a separate fee. (R4, tab 53 at 2-4, 6; tr. 1/29, 124; dep. at 20) The technical consultant Sprung provided on the East Range contract was FES (tr. 1/29, 124; dep. at 20).

The owner of FES started his business around 1981 under the name "Formal Affairs" while working full time for a major defense contractor. Initially, the business was a weekend events company renting traditional tents principally for weddings, but expanded into doing commercial work such as trade-shows and corporate promotional events, allowing the owner to work full time for his own company. Because "Formal Affairs" sounded like a local firm, the company began trading under the name "Florida Exposition Services," even though both it and its owner were located in California. (Dep. at 10-13, 16-17) About 1998, after installing a fabric structure and completing a corporate event on an athletic field in Montreal following one of that area's worst ice storms, Sprung offered to make FES a "technical consultant" and keep it so busy it

would not be able to handle other events. Since that time, FES primarily has been doing assembly and installation services for fabric structures leased or sold by Sprung. Essentially, Sprung is the lifeblood of its business; it does no marketing or advertising of services to others. As a technical consultant for Sprung dismantling structures used for corporate events, FES frequently was offered structures for which a purchaser had no further use and/or did not wish to remove or store. FES, through its "sweat equity," was able to remove unwanted structures and accumulate reusable fabric, aluminum beams, and other components from dismantled Sprung structures in its California work yards. (Tr. 1/132; dep. at 25, 35, 37, 41, 189-92)

On 10 April 2006, SWR's vice-president, Timothy Scott Swindall, arrived in Hawaii by plane to attend a post-award meeting with Army personnel and to work with Mr. Lee King, SWR's regional manager, to perform preparatory work necessary for the 0013 Contract. He rented beachfront lodging for one month for $2,000. (App. ex. 4, tab 7 at 1216, 1219; tr. 3/188)

Less than a week after award, on 13 April 2006, Sprung submitted to SWR a quote valid for 60 days for a one-year lease of a 70-foot by 235-foot stressed fabric membrane structure for $11,317 per month (app. ex. 17, tab A at 3). The same day it received the quote, SWR issued a check to FES for $75,000. Nothing on the check identifies its purpose. While the check was recorded in the QuickBooks accounting system used by SWR, the company's financial records provide no clue as to its purpose. (R4, tab 50; tr. 2/74, 76, 81) The owner of FES testified at his deposition he did not wish to compete with Sprung because it was the lifeblood of his business, but he believed he had been given a "green light" to work with SWR because Sprung had advised during November it was not bidding on the work and would prefer to see FES involved, rather than "Aztec," a competing fabric structure manufacturer (dep. at 65-69, 74, 191-192). In mid-April, therefore, FES began collecting components of the various fabric structures stored in its work yards for shipment to Hawaii for use by SWR, apparently unaware Sprung recently had submitted a quote to SWR (dep. at 90-91).

On 17 April 2006, Mr. Swindall and Mr. King attended a "post-award conference" with Army contracting personnel at Fort Shafter to achieve a clear and mutual understanding of contract requirements, and identify and resolve potential problems (R4, tab 52 at 1, 7; tr. 1/154-55). During the conference, SWR advised that stockpiled concrete was being processed into gravel for the floor of the POV storage location (R4, tab 52 at 5). The week before contract award, via emails, the Army had sent SWR photos taken on a site visit made 23 March 2006; stated its understanding that pieces of concrete on-site were to be ground for gravel surface; and asked SWR to provide "specifics and timelines" for its proposed site because its proposal did not address site specific mobilization. SWR subsequently responded by email that: it had negotiated a lease with Pineridge Farms, Inc., (Pineridge Farms) for up to 12 acres of a 50-acre property at Waianae, Hawaii, that previously was the site of a concrete plant;

6

Pineridge Farms would clear areas designated for the lease and recycle stockpiles of concrete and rock debris on-site into crushed gravel to "surface" areas leased; the necessary equipment and manpower for Pineridge Farms' effort were on site and ready for initialization; such action would be initiated on award; and its proposed timeline included accelerating debris removal and existing concrete recycling for the surfacing of initial storage structures. (R4, tab 26 at 829-30, tab 27 at 825; tr. 1/146-47) During a post-award site visit, the Army confirmed that "there was a rock crusher and men working with bull dozers moving gravel and debris around" the Pineridge Farms site (R4, tab 31 at 1).

On 19 April 2006, Mr. Swindall departed Hawaii by airplane. During his stay, according to SWR's QuickBooks software-generated records, in addition to lodging, he incurred the following costs: $427.02 for a rental car, $24.45 for gasoline, $78.32 at an Outback Steakhouse, $92.62 at Sack N Save, and $391.28 at Kmart (R4, tab 9 at 60, tab 11 at 12-21; tr. 1/201-02, 208).

The same date, 19 April 2006, FES cashed SWR's $75,000 check dated 13 April 2006. The next day, FES obtained a cashier's check for $75,000 to be paid to the order of Classic Tents, which had just acquired Aztec Tents, another manufacturer. The owner of FES testified at his deposition that the cashier's check was a deposit for three easier to install 40 foot by 1000 foot fabric structures FES was purchasing from Aztec for $474,000. While FES's owner did not know anyone else who ever had used 40 foot by 1000 foot structures, the unusual dimensions were chosen to facilitate easy removal of POVs. FES figured a parking space was about 10 feet by 20 feet and such a structure would allow the POVs to be parked "nose-to-nose," two deep for a distance of 1000 feet, thereby avoiding any need for a covered driveway to remove vehicles and the movement by SWR of numerous vehicles (some with dead batteries and flat tires) in order to return a vehicle to a returning service member. (R4, tabs 50, 51; tr. 1/117, 146; dep. at 28-29, 80-82, 171, 277; see R4, tab 3 at 10-12; tr. 1/221)

On 20 and 22 April 2006, Phoenix-PDQ, a drayage company specializing in transport to seaport for further shipping, sent empty flatracks to FES in Victorville, California. Because it is too difficult to place aluminum beams in "containers," FES loaded them onto flatracks (comparable to a flatbed) for transport to Los Angeles Harbor and across the Pacific Ocean to Hawaii. Loading of the flatracks took several hours and the flatracks then returned to the Harbor. Similarly, on 20 and 21 April 2006, at the cost of FES, Phoenix-PDQ shipped drayage from Aztec Tents of Torrance, California (the three new 1,000 foot long fabric structures) to the Harbor. (Tr. 1/147-49; dep. at 87, 90-93; dep. ex. 5 at 2-4)

After receiving a debriefing from the Army, The Pasha Group (Pasha) filed a protest (B-298230) with the General Accountability Office (GAO) of the Army's award of the POV contract to SWR. Pasha challenged SWR's technical proposal and past performance evaluation, contended the Army engaged in improper discussions

7

with SWR, and suggested the leased property proposed by SWR was not suitable and could not be made suitable in time to perform. (R4, tab 29 at 4, tab 31 at 1, tab 57)

As a result of the protest, the Army's CO, Geralyn M. Ambrosio, issued a "Stop Work" order directing SWR as follows:

> [T]he Contractor is hereby directed to stop work under this contract effective 27 April 2006. Suspend all further shipment of equipment, installation and training of personnel. It is anticipated that the [l]ength of this stop work will be for a period of approximately 30 days, however actual stop work time may be shorter or longer.

(R4, tab 5 at 1, 3; tr. 2/138-40, 142) While 33 U.S.C. § 3553(d)(3)(C) allows performance of a contract to continue after agency notice of a protest if the head of the procuring activity makes a "written finding" that performance is in the best interests of the United States or urgent and compelling circumstances significantly affecting interests of the United States will not permit waiting for a decision upon the protest, no such finding was ever considered or sought by the Army here (tr. 3/50).[1]

SWR told FES a stop work order was issued because "there was a battle going on between SWR and Pasha" over the contract, it thought the order would be removed, and it intended to bid on any bridge contract solicited during pendency of the protest. FES advised SWR the firms should not stop work, but "keep going." (Dep. at 95, 101, 111) SWR agreed it was best not to halt efforts to ship fabric structures because SWR needed to "stay positioned" to perform the work and be ready to compete in whatever contract action Fort Shafter might take based on the protest (tr. 1/238, 240-41). During May 2006, FES did not abide by the CO's stop work order but kept "going." It obtained bills of lading from Matson Navigation to ship to Hawaii the fabric structures that had been transported to the Los Angeles Harbor. (R4, tab 9 at 31-33; dep. ex. 4 at 1-3) FES's owner testified during his deposition that it takes about 3 or 4 days for cargo shipment to arrive in Hawaii once it has departed Los Angeles Harbor (dep. at 91). According to bills that FES received from Matson's agent for "detention" at the port in Hawaii, the FES cargo arrived in Hawaii on 8, 9, 10, 19, 23 and 26 May 2006 (R4, tab 9 at 41-50).

In late May 2006, SWR prepared an affidavit in response to the GAO protest stating that the allegation it does not have a site and structures ready and available to perform is unfounded. SWR explained the "site will require some minor grading and

---

[1] The CO stated in her stop work order that the order was issued pursuant to FAR "52.212-13," a provision that did not exist in the FAR at the time of her order. 60 Fed. Reg. 48231. As discussed, however, both SWR and FES were fully aware her order was issued due to Pasha's filing of a bid protest.

other excavation work which was underway prior to the stay"; it "expect[s] the site can be made ready within seven (7) to ten (10) days"; and site perimeter fencing "can be accomplished within a matter of days." SWR added:

> SWR has obtained structures manufactured by Sprung. We have used these structures on similar POV storage contracts in the past. We have an agreement with an experienced contractor who will erect, install, and dismantle the Sprung structures. Upon notice of award, we initiated the delivery order of the structures necessary to perform under the contract. These structures are now in port in Hawaii waiting to be delivered to the contract site for erection.

(R4, tab 57)

Due to the pending protest and imminent expiration of the existing POV storage contract, on 25 May 2006, the Army entered into a sole-source "Bridge Contract," No. W912CN-06-P-0365, with SWR providing for storage services for an estimated 800 vehicles for a period of three months. The unit price for warehouse storage, $950.83, was the same as for the 0013 Contract. (R4, tabs 31, 56, 58 at 1, 3, 18, 20, 52; see R4, tab 4 at 16; tr. 1/211-12, 263, 2/161)

SWR obtained an alternate location to perform the Bridge Contract (R4, tab 31 at 1). It decided the three "Fast Tents" FES acquired from Aztec could be installed the quickest and would cover the required number of POVs (tr. 1/172, 189, 220-21, 242; dep. at 265). FES, "already having the structures from the Original Contract in Hawaii, leased a portion of the structures for use in the Bridge Contract to SWR for $30,000 a month" and installed the three structures at the Barbers Point site (R4, tab 101 at 2 (April 2012 Swindall affidavit); tr. 1/279-80, 2/30-31; see tr. 1/172, 178). On 1 June 2006, FES issued SWR an invoice in the amount of $30,000 and on 20 July 2006 SWR issued FES a check for $30,000 (R4, tabs 59, 68; dep. ex. 8 at 1). During June 2006, Aztec billed FES for the three 40-foot by 1000-foot Fast Tents and FES annotated Aztec's bill as incorrectly stating the purchase price as $632,000 when the price was $474,000 (R4, tab 62; dep. at 171).

After a GAO conference by telephone concerning the protest, the Army agreed to take corrective action regarding the POV storage contract award. The protest record indicated the Army had continued communicating with SWR. The CO acknowledged such communications had occurred, but said they were unilateral from SWR and she did not rely on them in making her source selection decision. Her statement, however, was undercut when she admitted that her supervisor directed her, after Army receipt of proposals, to secure assurances of timely performance from SWR and the supervisor did not approve the Post-Negotiation memorandum until such assurances had been

9

received. (R4, tab 29 at 4) Another concern was that SWR's technical evaluation was based on a minimum order quantity, which was much less than the stated monthly requirement in the Performance Work Statement, raising concern that offerors were not all held to the same performance standard. The CO was not able to dispel this concern during the conference. (*Id.*)

On 3 July 2006, the Army issued Modification No. P00002 to the 0013 Contract terminating that contract in its entirety for the convenience of the government effective 1 July 2006. The Army informed SWR that the contract administration office would identify the CO who will be in charge of the settlement of this termination. (R4, tab 6 at 1, 9; tr. 2/144)

By invoice dated 1 July 2006, FES again billed SWR $30,000 and SWR issued FES a $30,000 check dated 20 September 2006 (R4, tab 64; dep. ex. 7 at 3). On 14 July 2006, the Army solicited a second bridge contract for storage of 2,000 vehicles from 20 July 2006 to 31 August 2006, which was awarded to Pasha on 18 July 2006 (R4, tab 65 at 3, tabs 66, 67).

On 14 August 2006, SWR submitted an invoice to the Army under CLIN AA (property lease) for the 0013 Contract in the amount of $157,897.30 (monthly unit price prorated to 22 days (6 to 27 April)). The same day, CO Ambrosio advised SWR its invoice would be handled as part of the Termination for Convenience Settlement claim. (R4, tab 8)

During the Bridge Contract, SWR's focus was to ensure it was in a position to compete for, and receive, award of the re-solicited POV storage contract (tr. 1/172, 2/32). The Army subsequently extended SWR's Bridge Contract from three to nine months, i.e., until 28 February 2007, allowing SWR to invoice the Army for over $1 million (gov't ex. 1 at 1-21; tr. 1/221). By invoice dated 1 August 2006, FES once again billed SWR for $30,000 and did so every month for the next six, but the record does not reflect the number of FES invoices actually paid by SWR (R4, tabs 83, 84; dep. at 62-63, 260, dep. ex. 8 at 3-9, dep. ex. 13 at 53; *see* R4, tab 100).

During fall of 2006, FES began selling some of the fabric structures shipped from its yard to Hawaii. On 13 September, FES sold two 70-foot by 250-foot structures to Sprung for $183,000. Five days later, on 18 September, FES additionally sold two 70-foot by 220-foot structures to Sprung for $162,000. FES retained all proceeds from the sales of these structures. (Dep. at 146-60, 184-85, dep. ex. 10 at 1-2, dep. ex. 13 at 19-20)

By "Bill" dated 2 November 2006, Pineridge Farms, owner of the site where the terminated contract was to be performed, sought payment of the following:

1. LETT INC. – Engineer fees to draft plans and to
assemble permit applications for solid waste permit,
grading permit, NPDES permit, fence permit and electrical
permit $5[,]000.00

2. Charges for equipment and labor to grade and grub
10 acres, relocate containers and equipment, remove and
level stockpiles $10,000.00

(R4, tab 9 at 58) Pineridge Farms, therefore, sought a total payment of $15,000 (*id.*).

As part of his preparation of a termination for convenience claim, on 16 December 2006, Mr. Swindall sent FES an email stating he needed two separate invoices from FES – one for $6 million per a discussion on 10 November 2005 with SWR owning the structures and one for $6 million with a credit for FES retaining the structures (dep. ex. 13 at 98). Shortly thereafter, FES sent SWR an invoice dated 21 December 2006 for $6 million for the "purchase of 379,000 sq. ft. of clear span membrane structure" and another dated 21 December 2006 for the identical purchase with the option of FES crediting to SWR $2 million for a "'Buy Back' option" (dep. at 132, dep. ex. 13 at 100-01).

In early 2007, the CO re-solicited proposals to perform POV storage services at Fort Shafter. During February 2007, the Army notified SWR it was not successful in obtaining the contract and SWR filed a protest with GAO of the award to Pasha. The Army sought to extend SWR's Bridge Contract as a result of the protest, but SWR insisted upon higher prices, which the CO was not sure were reasonable. The CO subsequently entered into a bridge contract with Pasha and, on the next to last day of the month, the Army began transferring POVs SWR was storing to Pasha. At about the same time, SWR notified the Army that: it purchased fabric structures from FES for $6 million to perform the POV contract; it has no use or buyer for the structures; the seller will repurchase the structures only at a deep discount; the CO has indicated the Army is not interested in the structures; SWR had planned to utilize some of the structures if it was re-awarded the contract, which would have mitigated costs, but SWR did not receive the award; and SWR was now soliciting Army input on how best to handle this matter. (R4, tabs 87, 88, 89, 91, 94; tr. 1/263; dep. at 171, 186-187)

On 14 March 2007, GAO denied SWR's protest as "academic" because the Army was taking "corrective action" (R4, tab 38 at 12, tab 85; tr. 1/179-80). About two weeks later, FES sold the "beams" for the three Fast tents, which had been manufactured by Aztec about a year earlier and used on the Bridge Contract, to Classic, the company that had acquired Aztec when the tents were being made, for $195,000, or less than half the structures' purchase price. FES shipped component pieces and parts left over from the sale of the beams back to its yards in California. The agreement of sale stated the tents are being sold "used" and "as is," all payments

11

are to be made to FES, Classic and "FES" will arbitrate any disputes that arise with respect to the sale, and the signatories to the agreement are Classic and "FES." No mention or reference is made in the agreement to SWR. (R4, tab 78; dep. at 29-32, 171, 186-187) Three months later, by letter dated 29 June 2007, SWR sent to the Army a Termination for Convenience settlement proposal and completed Standard Form (SF) 1435 that had been furnished to SWR with the modification terminating the contract. SWR stated it was a small business, had never previously prepared such a proposal, and had not received a response from the Army to its February letter seeking "input" with respect to handling fabric structures "purchased." SWR added the majority of its costs arise from the purchase price and transportation for the structures, less the salvage value determined by an appraisal it had procured. In its proposal, SWR sought:

1. Site preparation costs for Pineridge Farms of $15,000;
2. Personnel costs of $3,588.64 for Mr. King's salary;
3. Travel expenses for Mr. Swindall of $3,123.60;
4. First month "property lease" CLIN AA cost of $215,314.63;
5. Structure transportation costs of $12,383.91 for Phoenix-PDQ, $96,522.61 for Matson Navigation, and $7,387.48 for Royal Hawaiian shipping to Barber's Point;
6. Storage costs of $48,697.30 for Barber's Point and $65,620 for the port in Hawaii;
7. Legal expenses of $5,893.35 for Albrittons, Clifton and $7,270 for Smith, Currie & Hancock, LLP;
8. General and Administrative (G&A) expense and profit calculated as a percentage markup; and
9. Used structure purchase costs of $6 million (less $750,000 fair market value appraisal of used structures by the President of Aztec tents).

The total sought on the SF 1435 was $6,703,740.78. (R4, tab 9 at 1, 4, 5, 11, 12, 19, 21; tr. 1/194, 2/184)

By letter dated 11 September 2007, Army Termination CO (TCO) Adrian Ledoux, Jr., advised SWR he had reviewed the 29 June 2007 settlement proposal but required sufficient supporting information and answers to various questions before he could negotiate a settlement. As a threshold matter, he stated that the termination settlement is limited to costs incurred through termination of the base period and thus cost of the structures should be limited to one year of the structure's useful life. He asked why the fair market value appraisal was so much less than the purchase price claimed and requested a copy of the paperwork related to the asserted purchase. With respect to the transportation and storage costs, he noted that most appeared to have been incurred after issuance of the CO's stop work order and others appeared to be incurred for the Bridge Contract. He wanted to know why SWR was seeking costs incurred by another firm. He explained that the payment of a CLIN for a

12

month was not possible because the Army never issued any delivery orders and no work was performed under the contract. He urged SWR to respond to his questions and supply requested information because almost all of SWR's proposed settlement amount currently appeared unacceptable. TCO Ledoux recognized that SWR did not have to submit an SF 1435 used with long form convenience termination clauses because SWR had a "commercial items" contract. He believed, however, that SWR would receive no monies under the short form commercial items clause and he simply was attempting to arrive at a fair settlement. (R4, tab 10; tr. 1/194, 2/146, 148, 179, 182-84, 188, 190, 213-14)

In March of 2008, shortly after TCO Ledoux left Hawaii for a new job in Europe, SWR responded to his September 2007 letter. SWR acknowledged that the rule is expenses are limited to the initial performance period, but asserted that it fell within an "exception" to the rule because the Army improperly made award and thus "breached" the contract. SWR added that a substantial capital investment had to be made to perform the contract, bidders cannot "unbalance" their bids in reflecting such a cost, exercise of the options therefore was reasonably certain, and the contract price for purposes of a convenience termination proposal should be base year plus all option years. SWR stated, without explanation, that the useful life of the structures has no bearing on costs incurred and that it had no paperwork regarding its claimed 2006 purchase of used structures for $6 million, other than a "November 2005" FES "quote" stating on its face that the quote was valid only for "10 days." With respect to other claimed costs, SWR attached additional documentation. (R4, tab 11; tr. 2/191, 202; *see* R4, tab 10)

By letter dated 13 November 2008, after receiving no response from a TCO to its March 2008 letter, SWR advised the Army that the parties had reached an impasse in their negotiations and it desired a CO's final decision on its proposal (R4, tab 17 at 8). On 24 November 2008, SWR advised it wished to meet and resolve the matter before year end and submitted a revised SF 1435 significantly reducing its claim (R4, tab 12). SWR explained that it "was able to sell some of the buildings" for $415,000 and FES now was willing to "re-purchase the remaining inventory" for $2,792,500, leaving a "balance due" of $2,792,500. SWR therefore had reduced "other costs" claimed from $6,252,323.54 to $3,044,823.54. (R4, tab 17 at 8; *compare* R4, tab 9 at 3 with R4, tab 12 at 3) On 13 January 2009, after receiving no response from a TCO to its March or November 2008 letters, SWR filed a notice of appeal with this Board (R4, tab 17 at 3). The same day, TCO (and Division Chief) Sandra Kim advised SWR that: it had been using an incorrect email address for her until 7 January 2009; she was the newly assigned TCO; and she had forwarded SWR's claim to the Defense Contract Audit Agency (DCAA) for performance of an audit. She desired an audit because she believed she could not act on the proposal with the information supplied. (R4, tab 16 at 1, tab 18; tr. 3/7, 9) Ten days later, on 23 January 2009, DCAA advised SWR that the revised SF 1435 did not contain any adjustments to G&A and profit based upon the reduction of other costs claimed and requested SWR

to certify the revised form (R4, tab 19 at 1, tab 20 at 1). In mid-February 2009, SWR made the necessary adjustments to the revised SF 1435, furnished the necessary certification and moved to stay its appeal before this Board (R4, tabs 21, 22; tr. 3/10).

On 1 July 2009, SWR filed for bankruptcy reorganization pursuant to Chapter 11. By order dated 6 August 2009, the bankruptcy court approved employment of SWR's counsel as special counsel to pursue its appeal pending before this Board. (R4, tab 32 at 1, tab 38 at 13) FES subsequently filed a proof of claim with the bankruptcy court stating SWR owed it "$2,792,500.00" for "contract default" and it "started [its] performance under this contract [with SWR] **in March 2006**, by shipping the structural components from California to Hawaii by ocean freight" (R4, tab 35) (emphasis added).

DCAA issued its audit report on 9 June 2010. The report found SWR's claim was not an acceptable basis for negotiating a fair and reasonable price because, among other things, the firm's "books and records do not contain verifiable evidence of the $6 million building purchase price [FES claimed] or evidence of the selling and buy-back credits" FES asserted. DCAA explained:

> SWR's books and records do not reflect any accounting entry for the claimed $6,000,000 buildings expense. We obtained the contractor's financial statements for FY 2005 and FY 2006. We did not see the $6,000,000 building recorded as an asset, in accounts payable or on its 2005 & 2006 tax returns. The contractor did not record the $6,000,000, either as a period expense during FY 2005 or FY 2006 or as a capital expense to be depreciated over the useful life of the asset(s). Thus, the entire amount…is questioned due to the lack of verifiable evidence.

(R4, tab 99 at 6) DCAA noted that, while SWR had asserted the structure purchase price did not appear in its records because it operates on a cash basis, its accounting system is, in fact, on an accrual basis and only its tax returns are filed on a cash basis. DCAA added it did not see the $6 million structures recorded as an asset, in accounts payable or on the firm's 2005 and 2006 cash basis tax returns, or any entries for either of the credits claimed. (*Id.* at 1-2, 6-7)

DCAA also raised issues with most other costs claimed. DCAA questioned the structure transportation and port storage costs claimed because SWR's pre-award proposal indicated transportation and installation were being provided by FES[2] and

---

[2] In its 21 February 2006 revised proposal submitted to the CO, SWR stated: "Sprung Structures will be installed for vehicle housing" and FES will "provide, install and dismantle proposed structures." SWR stated further that it was "procuring

invoices for transportation and port storage costs indicated they had been incurred by FES, rather than SWR. DCAA questioned the storage charges at "Barber's Point" because that land was being used for the Bridge Contract performed by SWR and it was presented no invoices for such costs. DCAA questioned the Pineridge Farms site costs because it could not establish that the services billed occurred prior to termination and because it received no proof of payment from SWR. DCAA questioned travel expenses incurred by Mr. Swindall and wages paid to Mr. King because SWR could not demonstrate (and DCAA could not verify) those costs were, in fact, associated with the 0013 Contract. It questioned $215,315 claimed under CLIN AA because SWR had corroborated no vehicles were stored under the 0013 Contract. DCAA questioned $5,893 of the $13,163 claimed in attorney fee settlement expenses based on lack of invoices for those charges. Because it took exception to all base costs claimed, DCAA additionally questioned G&A and profit claimed. (R4, tab 99 at 8-13, 15-16)

While the DCAA audit was being completed, proceedings in SWR's Board appeal resumed and, on 19 April 2012, SWR filed an amended complaint removing from its $3,905,742.12 claim amounts that discovery and additional factual investigation had shown were incorrectly sought. According to SWR, "shipping costs in the amount of $116,294 were incorrectly charged" and the government should receive "a credit in the amount of $270,000 for a portion of tent structures used in another contract." The new sum sought was $3,519,448.12. Essentially, SWR eliminated its claim for fabric structure transportation and credited its monthly $30,000 due to FES under the Bridge Contract against the sum it claimed was due and owing FES for the purchase of the structures. In support of its amended complaint, SWR submitted an affidavit from Mr. Swindall stating:

> 15. The performance of the Bridge Contract required similar structures to those that were to be used in the Original Contract.
> 16. [FES], already having the structures from the Original Contract in Hawaii, leased a portion of the structures for use in the Bridge Contract to SWR for $30,000 a month.
> 17. SWR paid [FES] $30,000 a month from June 2006 to February 2007 for use of the structures on the Bridge Contract.

(Amended compl., affidavit of Timothy Swindall at 2-3)

---

these structures at below normal market value" but did not expressly state either the "method" or "cost" of such procurement. (R4, tab 3 at 9)

During November of 2012, the Board held a three-day trial in this appeal where Mr. Swindall testified that in 2006 SWR had "purchased" used fabric structures from FES, plus three new Fast Tents that FES acquired from Aztec, for $6 million. While he had submitted an affidavit to the Board six months earlier stating that SWR leased a portion of the structures for use on the Bridge Contract for $30,000 a month, at trial, he stated the affidavit was a mistake and he did not lease any of the tents from FES for the Bridge Contract. In response to questioning, Mr. Swindall acknowledged SWR did not have a written purchase agreement with FES, any document reflecting SWR's scope of understanding with FES regarding the purchase, or bank statements or other financial records indicating SWR paid FES $6 million or any other sum for purchase of the fabric structures. (Tr. 1/230, 237, 251, 256, 275, 2/40, 56-57)

The owner of FES who purportedly entered into the purchase agreement with SWR was not subpoenaed to testify at trial. The parties stipulated to admission of his deposition testimony because he apparently was in Haiti. While he was able to testify readily at his deposition about some matters, he had difficulty recalling others. For example, he did not remember being told SWR had obtained the POV storage contract and, while he thought he was owed money, he did not remember how much money he had received from SWR. He testified that he "does not remember a lot of the stuff," "tend[s] to get confused," and "gets stuff screwed up." He explained he has had a problem the last couple of years with his driving skills and remembering, and had a brain scan. (Dep. at 57-60, 63, 75, 84; tr. 2/8-16) He added:

> My wife had me going for -- she, you know, they think it's Alzheimer's is what she's saying, but she's a nurse. So anyway, they came back and said I no longer have the equivalent to a college graduate, whatever that means, you know? So but I tend to get the time lines, numbers -- I'm not real good with the --
>
> I remember the '60s and the '70s. I don't remember the '80s and the '90s kind of thing. And if you'd tell me '89, I've got to write it on the paper, so I don't know if we're talking about '98. And I try really hard....
>
> ....
>
> ...It's just embarrassing, you know....
>
> ....
>
> ...I just don't know. Very simple things that I should remember but I don't.

16

(Dep. at 59) When questioned during his deposition about the proof of claim form filed by FES with the bankruptcy court, he stated he did not know the month that FES's contract with SWR alleged in the claim form arose (dep. at 222-24). He also testified he did not recall there being any requirement of a "deposit" for FES's claimed contract or any contract payment term, other than FES was to receive $6 million sometime in the following three years (dep. at 70-71, 75).

Dorothy Elaine Doherty, who was the DCAA auditor who reviewed the audit report before issuance, a Certified Public Accountant, and 24-year DCAA employee, also testified at trial. She explained that DCAA's job is to crunch numbers – follow the costs claimed through accounting records and determine if costs are valid under the circumstances. She noted that, if a contractor buys a piece of equipment or incurs a debt, DCAA expects that to be recorded somewhere in the accounting records. She said DCAA looks for: an invoice; purchase order; some kind of financing agreement; an accounts payable; a signed note for the sum; a contract; something recorded; something indicating the contractor recognizes a liability it has to pay. It expects some kind of record of that transaction. Here, however, DCAA was unable to find anything in SWR's accounting entries justifying the structure cost claimed. In sum, DCAA did not find any proof of a $6 million purchase by SWR of structures from FES in SWR's books and records. She explained:

> [T]he way accounting works is you -- you buy something and you pay for it. You pay for it either with cash, or with a note, or with a -- a receivable, or…a payable…. I tell somebody I want to buy that machine. I usually give them a purchase order to say I want to purchase this from you. You know, they give me back an invoice and they deliver that, whatever it is, that machine. They deliver that machine and it comes with an invoice. I take that machine and I either expense it in this period, this year, depending on the value, or I say, okay, this becomes an asset, or this is something I can only use on this contract and then it becomes a direct contract cost.

While SWR provided DCAA with its general ledger, profit and loss statement, and tax records, DCCA did not find the contractor had recorded a $6 million fabric structure purchase as a period expense during fiscal year (FY) 2005 or FY 2006, or as a capital expense to be depreciated over the useful lives of the assets. She said that a capital expense would be a building, large piece of machinery, or something that lasts for longer than a year and thus should be depreciated over the useful life of that asset. She emphasized that SWR's records reflected "no asset entry, no note payable, no accounts payable, no anything." She added that, while SWR's tax returns were filed on a cash basis, meaning a cost is recorded in the year in which it is incurred or paid, SWR's accounting records were on an accrual basis in accordance with Generally Accepted

17

Accounting Principles, which require accounting for costs in books and records that may be incurred in one period even though the cost extends into another period. DCAA found SWR's books and records to be on an accrual basis because they had a line item for "accounts receivable discount," which one does not have in a "cash-basis" financial statement, and the QuickBooks profit and loss statement entries reflected they were on an accrual basis. (Tr. 3/91-92, 94, 122, 124, 127-29, 131-36, 183-84)

During her testimony, the auditor noted that DCAA generally does not receive audit requests under FAR Part 12, received SWR's claim on an SF 1435 identified in FAR Part 49, and assumed it was auditing under Part 49. The agency's conclusions discussed in the report, however, would not change if it audited under FAR Part 12 because they simply were that SWR's records do not reflect any proof of purchase of fabric structures for $6 million or some other sum. (Tr. 3/103, 107-08, 120, 127)

At trial, CO Ambrosio testified that her 6 April 2006 letter advising SWR of contract award was a "standard letter," not a delivery order (which is issued on an SF 1449 and states "delivery order/task order"). She explained the standard letter simply informs a contractor it has obtained award, and as expressly set forth in the letter, the contractor "may commence performance as required by the contract's provisions." CO Ambrosio emphasized that SWR's contract with the Army was a requirements contract -- when the Army had a requirement for services, it would issue a delivery order for those services obligating necessary funds and informing the contractor of both the services needed (by CLIN) and the service delivery period. She added, pursuant to the contract, SWR had 30 days from issuance of a delivery order to place the quantity of POVs for which services were ordered "under roof" and the Army did not issue a delivery order to SWR under the 0013 Contract. (Tr. 2/96-97, 99, 100, 110, 122-24, 137-38, 164-65; R4, tab 4 at 1)

With respect to the $15,000 cost claimed for Pineridge Farms, Mr. Swindall further testified during trial that SWR had a graduated property lease with Pineridge Farms, which would allow it "out of the lease" based on the payment of specified sums if for some reason the POV storage contract did not "go full term." SWR thus could "opt out" of the lease shortly after award of the 0013 Contract upon payment of $35,000. SWR discussed its situation, i.e., submission of a bid protest and contract termination for convenience, with Pineridge Farms and that firm was sympathetic with SWR's plight. It agreed to let SWR "opt out" of the lease for payment of the $15,000 in expenses it incurred with respect to engineering fees and for clearing and grading the property for the lease, rather than the $35,000 SWR believed Pineridge Farms was owed for early termination of the property lease. (Tr. 1/194-95; R4, tab 9 at 58)

With respect to the wages claimed for Mr. King, Mr. Swindall identified at trial check numbers and pay stubs showing SWR paid Mr. King $1,786.24 for each of two pay periods – 1 April 2006 through 15 April 2006 and 16 April 2006 through 30 April 2006. Mr. Swindall testified Mr. King was in Hawaii working full time for SWR

recruiting, interviewing potential employees, helping with site preparation, and arranging for acquisition of items needed to bring SWR to a fully operational state, such as portable toilets for the site. (Tr. 1/94-95, 197-98, 3/175; app. ex. 4, tab 6 at 1214-15)

With respect to calculation of overhead for SWR, Mr. Swindall and his sister-in-law, who worked for SWR, both testified that SWR used QuickBooks software to record payments received and made. They indicated the recorded information was used subsequently to generate profit and loss (P&L) statements for SWR. SWR used its QuickBooks records and P&L prepared internally to calculate its overhead rate for 2006 as 11.8%. (R4, tab 22 at 7-13; tr. 1/207-08, 2/74-75, 77, 87-88)

At trial, attorney billing records for both law firms employed by SWR were admitted into evidence establishing the number of hours and charges claimed here as attorney fees (app. ex. 10; tr. 1/205-06). In addition, a copy of SWR's 2006 Federal tax return was admitted. The return reflected SWR's expenses for items, such as vehicles, but not any purchase of fabric structures for $6 million or any other sum. (App. ex. 6, tab 22)

## Legal Framework

### I. Convenience Terminations

What is commonly referred to as a government "Termination for Convenience" – the government, under certain circumstances, ending a contract and settling with the contractor for part performance – dates from the Civil War. Recognizing that the continuation of contracts that rapid changes of war, or war's end, made useless or senseless was not in the public interest, the military commenced terminating contracts and settling with a contractor. Use of this termination concept generally enabled the government to stop or curtail the contract performance without involving itself in a contract "breach" that would make it liable for a contractor's anticipated profits. *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1540-41 (Fed. Cir. 1996), *cert. denied*, 520 U.S. 1210 (1997); *Torncello v. United States*, 681 F.2d 756, 759, 764 (Ct. Cl. 1982); *G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 426 (Ct. Cl.), *aff'd on recon.*, 320 F.2d 345, 348, *cert. denied*, 375 U.S. 954 (1963); *see United States v. Corliss Steam-Engine Co.*, 91 U.S. 321 (1875) (Navy authorized to settle with contractor upon compensation to be paid for the partial performance of contract); *United States v. Speed*, 75 U.S. 77, 82 (1868) (Rule No. 1179 in 1863 Army Regulations stated contracts "shall expressly provide for their termination at such time as the Commissary-General may direct").

During World War I, the military again relied on a termination clause set forth in its contracts to end the contracts after partial performance. For example, one clause used by the War Department provided:

19

*Termination.* -- This contract being necessitated by a state of war now existing, **it is desirable and expedient that provision be made for its cancellation upon fair and equitable terms in the event of the termination or limitation of the war, or** if in anticipation thereof or **because of changes in methods of warfare** the Chief of Ordnance should be of the opinion that the completion of this contract has become unnecessary. It is therefore provided that any time, and from time to time, during the currency of this contract, the Chief of Ordnance may for any of the causes above stated notify the contractor that any part or parts of the articles then remaining undelivered shall not be manufactured or delivered.

In the event of such complete or partial termination the United States shall inspect all completed articles then on hand and such as may be completed within thirty (30) days after such notice, and shall pay to the contractor **the price herein fixed for all articles accepted by and delivered** to the United States. The United States shall also pay to the contractor the **cost of the materials and component parts purchased by the contractor for the performance** of this contract and then on hand in an amount not exceeding the requirements for the completion of this contract provided they comply with the specifications, **and also all costs shown by the contractor to have been theretofore necessarily incurred in the performance of this contract and remaining unpaid;** and the United States shall also protect the contractor on **all obligations incurred necessarily and solely for the performance of this contract of which the contractor can not be otherwise relieved.** To the above may be **added such sums as the Chief of Ordnance may deem necessary to fairly and justly compensate the contractor for work, labor, and service rendered under this contract.**

*The Davis Sewing Machine Co. v. United States*, 60 Ct. Cl. 201, 203 (1925), *aff'd*, 273 U.S. 324 (1927) (emphasis added). The military, however, also relied on legislation enacted by Congress to halt performance of contracts. The Urgent Deficiency Appropriation Act, Pub. L. No. 65-23, 40 Stat. 182 (1917), authorized suspension or cancellation of any existing or future contract for the building, production, or purchase of ships or material where the government paid "just compensation therefor." 40 Stat. 182, 183; *see Russell Motor Car Co. v. United*

*States*, 261 U.S. 514 (1923); *Torncello*, 681 F.2d at 765. The Supreme Court held that, in "fixing just compensation," the value of the contract at the time of its cancellation must be considered, not monies the contract would have produced by way of profit if it had been fully performed, and thus anticipated profits were not due a contractor. *Russell Motor Car*, 261 U.S. at 523-24; *see College Point Boat Corp. v. United States*, 267 U.S. 12 (1925) (prospective profits are not recoverable against the government where it exercised statutory cancellation right). Similarly, after 1919, the military relied on the Dent Act, Pub. L. No. 65-322, 40 Stat. 1272 (1919), authorizing the War Secretary "to adjust, pay, or discharge any agreement, express or implied, upon a fair and equitable basis that has been entered into…during the present emergency" if such agreement has been performed in whole or in part:

> *Provided,* That in no case shall any award…include prospective or possible profits on any part of the contract beyond the goods and supplies delivered to and accepted by the United States and a reasonable remuneration for expenditures and obligations or liabilities necessarily incurred in performing or preparing to perform [the] contract or order….

40 Stat. 1272.

During the early days of World War II, both the War and Navy Departments were using clauses in many of their contracts providing for convenience terminations, and issuing regulations dealing with those provisions. *G.L. Christian & Assocs. v. United States*, 320 F.2d 345, 348 (Ct. Cl. 1963). Congress subsequently enacted the Contract Settlement Act of 1944, Pub. L. No. 78-395, 58 Stat. 649, establishing uniform legislative standards and procedures for termination of war contracts for the government's convenience. *G.L. Christian*, 320 F.2d at 348; *see Torncello*, 681 F.2d at 765. This Act stated:

> (b) Each contracting agency shall establish methods and standards, suitable to the conditions of various war contractors, for determining fair compensation for the termination of war contracts on the basis of actual, standard, average, or estimated costs, or of a percentage of the contract price based on the estimated percentage of completion of work under the terminated contract, or on any other equitable basis, as it deems appropriate.

58 Stat. 652. The Act further stated:

> (d) Except as hereinafter provided, the methods and standards established under subsection (b) of this section

for determining fair compensation for termination claims which are not settled by agreement shall be designed to compensate the war contractor fairly for the termination of the war contract, taking into account –

    **(1) the direct and indirect manufacturing, selling and distribution, administrative and other costs and expenses incurred by the war contractor which are reasonably necessary for the performance of the war contract and properly allocable to the terminated portion thereof under recognized commercial accounting practices**; and

    (2) reasonable costs and expenses of settling termination claims of subcontractors related to the terminated portion of the war contract; and

    (3) reasonable accounting, legal, clerical, and other costs and expenses incident to termination and settlement of the terminated war contract; and

    (4) reasonable costs and expenses of removing, preserving, storing and disposing of termination inventories; and

    **(5) such allowance for profit on the preparations made and work done for the terminated portion of the war contract as is reasonable under the circumstances**; and

    ....

    (7) the contract price and all amounts otherwise paid or payable under the contract.

58 Stat. 653 (emphasis added). The Joint Termination Regulation issued by the Navy and War Departments provided:

> The basic objective both of the [Contract Settlement] Act…and of the approved contract termination articles is to provide war contractors with fair compensation for their termination claims as expeditiously as possible in order to facilitate maximum war production during the war and to expedite reconversion from war production to civilian production as war conditions permit.

*Bolinders Company*, ASBCA No. 5740, 60-2 BCA ¶ 2746 at 14,003.

After World War II ended, in February 1948, Congress enacted the Armed Services Procurement Act of 1947, Pub. L. No. 80-413, 62 Stat. 21 (1948) (codified in 10 U.S.C. § 2301, *et seq.*) to provide a comprehensive framework for procurement by the military. Soon after, regulations began appearing which interpreted, explained and enlarged upon the Act. The Secretaries of the Army, Navy and Air Force formally issued the first three parts of the Armed Services Procurement Regulation (ASPR) in Title 10, Code of Federal Regulations effective May 1948. 13 Fed. Reg. 3074-3088. Parts setting forth standard contract clauses and addressing convenience terminations, however, did not issue until later. 17 Fed. Reg. 1791-1819 (1952); 14 Fed. Reg. 5077 (1949).

Early in the 1950s, the military entered into some contracts which contained termination clauses or articles that did "not refer to, or adopt as a part of the contract, any procurement regulation, directive, circular or statute which c[ould] serve as a guide to determine 'the amount due to the Contractor by reason of the termination.'" With respect to such contracts, this Board held:

> [We] must look to the contract itself and be guided merely by general contract laws and the rule of reason. We believe that the rule of reason dictates that the traditional method of settling contracts terminated for the convenience of the Government should be followed in this case. That method involves the **finding of the legitimate** costs of performing the terminated portion of the contract, adding thereto a reasonable profit plus reimbursement of a reasonable amount to cover the contractor's settlement expenses.

*L.P. Kooken Co.*, ASBCA No. 2091, 1954 ASBCA LEXIS 25, at *17-18 (14 Sept. 1954) (1951 negotiated fixed-price contract); *accord Atlantic Research Corp.*, ASBCA No. 3682, 57-2 BCA ¶ 1461 (1952 fixed-price contract); *compare Richard M. Smalley, d/b/a Oxnard Heavy Maintenance & Mfg. Co.*, ASBCA No. 2270, 1955 ASBCA LEXIS 959 (24 May 1955) (1951 contract article 21(d) and (e) discussing the amounts to be paid to a contractor based on convenience termination).

When ASPR Part 407, TERMINATION OF CONTRACTS, was issued in 1952, it provided that the bases upon which convenience termination settlement proposals may be prepared were as follows:

> (a) *Inventory Basis*. Under this basis the termination inventory is priced at purchase or manufacturing costs. To this amount are added the costs of the Contractor in settling with subcontractors and other applicable costs, and an allowance for profit or an

23

adjustment for loss, if any, is made. Use of the inventory basis will be generally preferred.

(b) *Total Cost Basis*. When use of the inventory basis is not practicable or will unduly delay settlement, the total cost basis may be used, provided its use is approved by the [CO]. Under this basis all the costs incurred under the contract up to the effective date of the termination are summarized and an allowance for profit or an adjustment for loss, if any, is made. All payments previously made or to be made by the Government for completed units are then deducted. To this amount are added the costs of the Contractor in settling with subcontractors and other applicable settlement costs. This amount represents the gross termination claim, from which are deducted disposal and other credits.

(c) *Other bases*. Termination claims will not be submitted on any basis other than paragraphs (a) or (b) [above] without the prior approval of the Secretary of the Department concerned or his duly authorized representative.

17 Fed. Reg. 1798; *Itek Corp.*, ASBCA No. 5175, 60-2 BCA ¶ 2673. ASPR Part 407 also set forth the following general principle: "[a] settlement should compensate the contractor fairly for the work done and the preparations made for the terminated portions of the contract, including an allowance for profit thereon which is reasonable under the circumstances." It added that "[f]air compensation is a matter of judgment and cannot be measured exactly," "[i]n a given case, various methods may be equally appropriate for arriving at fair compensation," and the "application of standards of business judgment, as distinguished from strict accounting principles, is the heart of a settlement." 17 Fed. Reg. 1795; *see Codex Corporation*, 226 Ct. Cl. 693, 698 (1981); Secretary of the Army, B-128375, 41 Comp. Gen. 379 (5 Dec. 1961).

In 1964, the first edition of the Federal Procurement Regulation (FPR) for "civilian" government contracts included "optional" termination for convenience clauses. *Krygoski Constr.*, 94 F.3d at 1541 (citing FPR 1-8.700-2). By 1967, the FPR required the inclusion of convenience termination clauses in most procurement contracts. *Krygoski Constr.*, 94 F.3d at 1541 (citing 32 Fed. Reg. 9683 (1967)). Accordingly, the concept of a convenience termination initially developed for military contracts evolved into a concept for both civilian and military. *See* FAR 49.502.

During the 1960s, the number of different convenience termination clauses set forth in regulations proliferated. *See, e.g.*, ASPR 8.701, 8.702, 8.704, 8.705 (30 Fed.

24

Reg. 5999-6000 (1965)); FPR 1-8.701-03, 1-8.704-1, 1-8.705-1, 1-8.705-2 (32 Fed. Reg. 9683 (1967)); and National Aeronautics and Space Administration Procurement Regulation (NASA PR) 18-7.702-20 (33 Fed. Reg. 6408 (1968)). Among those clauses was one commonly referred to as the "short form" termination for convenience, which provided for no recovery other than payment for services rendered. *Trans-Student Lines, Inc.*, ASBCA No. 20230, 75-1 BCA ¶ 11,343 at 54,027, *recon. denied*, 75-2 BCA ¶ 11,419 at 54,348 (ASPR 7-1902.16 (1968) (convenience termination clause provides "Government shall be liable only for payment in accordance with the payment provisions of this contract for services rendered prior to the effective date of termination"); *accord Guard-All of America*, ASBCA No. 22167, 79-1 BCA ¶ 13,874; *Mr's Landscaping & Nursery*, HUD BCA No. 76-29, 78-1 BCA ¶ 13,077; *Contract Maintenance, Inc.*, ASBCA No. 21186, 76-2 BCA ¶ 12,102; *Am. Maint. and Mgmt. Servs., Inc.*, ASBCA No. 19556, 76-2 BCA ¶ 11,960. Instructions for use of the "short form" clause, ASPR 7-1902.16(b), however, stated expressly that the clause could be used in lieu of any other convenience termination clause, regardless of the contract amount, only if "it has been reasonably determined that [a] termination for convenience would not result in a claim for anything but the services rendered." The instructions for the ASPR version of the clause referenced ASPR 8-705.1(b), which further stated:

> To facilitate the obtaining of services where it can reasonably be determined that the kind and volume of service required would not, in the event of termination for convenience of the Government, present a basis for a termination claim other than for services rendered (such as, but not limited to, most contracts for rental of unreserved garage space, meals for inductees, or laundry and dry-cleaning services), the short form termination clause in [ASPR] 7-1902.16(b) is authorized.

*Guard-All of America*, ASBCA No. 22167, 80-2 BCA ¶ 14,462 at 71,300; *Guard-All of America*, 79-1 BCA ¶ 13,874 at 68,065; *Am. Maint. and Mgmt. Servs.*, 76-2 BCA ¶ 11,960 at 57,340. When a CO used a short form clause in a contract where a contractor was likely to have a convenience termination claim for other than services rendered, this Board held repeatedly the CO's inclusion of the clause was arbitrary, capricious, and an abuse of discretion, and the long form (rather than the short form) clause was part of the contract under the *Christian* doctrine set forth by the Court of Claims in *G.L. Christian*, 312 F.2d at 418. *Tamp Corp.*, ASBCA No. 25692, 84-2 BCA ¶ 17,460 at 86,975, 86,978; *Guard-All of America*, 80-2 BCA ¶ 14,462 at 71,301-02; *accord C.F.S. Air Cargo, Inc.*, ASBCA Nos. 36113, 36126, 91-1 BCA ¶ 23,583 at 118,243 (CO action replacing short form clause with long form after termination reflected determination (albeit belated) that termination would result in a claim for something in addition to services rendered), *aff'd*, 944 F.2d 913 (Fed. Cir. 1991) (table); *Carrier Corp.*, GSBCA No. 8516, 90-1 BCA ¶ 22,409 at 112,557 (short form clause applicable only when it can be determined convenience termination will

25

not result in a claim for other than services rendered); *American Packers, Inc.*, ASBCA No. 14275, 71-1 BCA ¶ 8846 at 41,126, 41,129 (when contract contained both short and long form clauses, long form clause applied where contractor had both start-up and unrecovered running expense).

The short form termination clause continues to appear in the FAR today. FAR 52.249-4, TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (SERVICES) (SHORT FORM) (APR 1984); *see, e.g.*, *Laboratory Systems Services, Inc.*, ASBCA No. 47901, 95-1 BCA ¶ 27,527. FAR 52.249-4, like its predecessors, is to be used only when a CO "determines that because of the kind of services required, the successful offeror will not incur substantial charges in preparation for and in carrying out the contract, and would, if terminated for the convenience of the Government, limit termination settlement charges to services rendered before the date of termination." FAR 49.502(c), 52.249-4.

Similarly, more than 60 years after ASPR promulgation, the bases for submitting convenience termination settlement proposals under fixed-price non-commercial item contracts and the general principles for such settlements remain the same. Regulations governing the submission of long form convenience termination settlement proposals continue to provide that the inventory basis is the preferred method for proposal preparation and use of the total cost basis must have prior CO approval. FAR 49.206-2(a), (b). Moreover, the procurement regulations continue to set forth as general principles that:

> A settlement should compensate the contractor fairly for the work done and the preparations made for the terminated portions of the contract, including a reasonable allowance for profit. Fair compensation is a matter of judgment and cannot be measured exactly. In a given case, various methods may be equally appropriate for arriving at fair compensation. The use of business judgment, as distinguished from strict accounting principles, is the heart of a settlement.

FAR 49.201(a).

## II. Commercial Item Contracts

Complaints arose that, among other things, commercial contractors were being required to comply with complicated and burdensome legislation and regulations, such as government-unique audit and accounting requirements, quality assurance programs, submission of cost data, and certifications (which increased a contractor's exposure to civil and sometimes criminal penalties), often necessitating a company change the way in which it conducted business and increasing the cost of a firm doing business, causing

some companies to refrain from doing business with the Federal government and thereby possibly depriving the government of market-based prices and cutting-edge technology. *See, e.g.,* H.R. Rep. No. 103-545, pt. 2, at 104 (1993); Carl L. Vacketta & Susan H. Pope, *Commercial Item Contracts: When is a Government Contract Term or Condition Consistent with "Standard" or Customary Commercial Practice,* 27 Pub. Cont. L.J. 291 (1998); Lynda Troutman O'Sullivan & Douglas E. Perry, *Commercial Item Acquisitions,* 97 Briefing Papers 5 (1997). During 1991, Congress directed the Defense Department to establish an advisory panel (commonly referred to as the "Section 800 Panel") to recommend measures to "streamline" the defense acquisition laws. National Defense Authorization Act for Fiscal Year 1991, Pub. L. No. 101-510, § 800, 104 Stat. 1485. In January of 1993, the Section 800 Panel released a nine-volume report making numerous recommendations for procurement reform, especially in the area of commercial item acquisition. The Section 800 Panel stated that a reason earlier efforts to encourage acquisition of commercial items had failed was because there was no statute providing a uniform definition for commercial items and, more importantly, no statute eliminating the government-unique laws and regulations placing special burdens on commercial firms contracting with the Federal government. It stated that "[o]ne of the most expensive and disruptive [government-unique] requirements involves mandatory adherence to cost principles and accounting standards enumerated in statute, in the FAR, and by the Cost Accounting Standards Board." Acquisition Law Advisory Panel, *Streamlining Defense Acquisition Laws: Report of the Acquisition Law Advisory Panel to the United States Congress* at 8-5 to 8-7 (Jan. 1993). With respect to the FAR, the Section 800 Panel proposed regulations be promulgated:

> which shall contain a set or sets of uniform terms and conditions to be included in contracts for the acquisition of commercial end items...modeled to the maximum extent practicable on commercial terms and conditions and shall include only those contract clauses...that are –

> (A) required to implement provisions of law applicable to commercial item acquisitions;

> (B) essential for the protection of the Federal Government's interest in an acquisition; or

> (C) determined...to be consistent with standard commercial practice.

Acquisition Law Advisory Panel, *Streamlining Defense Acquisition Laws* at 8-54. With respect to statutes, the panel recommended that commercial item contracts not be subject to: 10 U.S.C. §§ 2393, 2402, 2408, 2507, 2631; 15 U.S.C. §§ 637(d)(4), (d)(5), (d)(6), 644(d), (e), (f); 29 U.S.C. § 793; 31 U.S.C. §§ 1352 note, 4212;

41 U.S.C. §§ 51-58, 701; and 46 U.S.C. App. § 1241(b). Acquisition Law Advisory Panel, *Streamlining Defense Acquisition Laws* at 8-56.

Subsequently, Congress enacted the Federal Acquisition Streamlining Act of 1994 (FASA), Pub. L. No. 103-355, 108 Stat. 3243. Among other things, FASA established a preference for acquisition of commercial items (§ 8104, 108 Stat. 3390 (military); § 8203, 108 Stat. 3394-95 (civilian)), provided an expanded "uniform" definition of a "commercial item" (§ 8001(a), 108 Stat. 3384-85); generally exempted commercial item contractors from submitting cost or pricing data under the Truth in Negotiations Act (TINA) (§ 1251(a), 108 Stat. 3278, adding 10 U.S.C. § 2306a(d) and 41 U.S.C. § 254b(d)); specified that the FAR contain regulations: (1) implementing the commercial item provisions newly added to 41 U.S.C. § 403 (§ 8002(a), 108 Stat. 3386), (2) permitting, to maximum extent practicable, a commercial items contractor to use its existing quality assurance system (§ 8002(e)(1), 108 Stat. 3387), and (3) listing laws which are not applicable to commercial item contracts (§ 8003, 108 Stat. 3388); and, mandated contract clauses concerning contingent fees (*see* 10 U.S.C. § 2306(b)), identification of suppliers and sources of supplies (*see* 10 U.S.C. § 2384(b)), reports by employees of defense contractors (*see* 10 U.S.C. § 2397(a)(1)), and limits on employment of some former DoD officials (*see* 10 U.S.C. § 2397b(f)) were not applicable to commercial item contracts (§ 8105, 108 Stat. 3392). With respect to FAR contract clauses to be set forth in commercial item contracts, FASA provided:

> The regulations prescribed...shall contain a list of contract clauses to be included in contracts for the acquisition of commercial end items. Such list shall, **to the maximum extent practicable**, include only those contract clauses –
>
> (A) that are required to implement provisions of law or executive orders applicable to acquisitions of commercial items or commercial components, as the case may be; or
>
> (B) that are determined to be consistent with standard commercial practice.

FASA § 8002(b)(1), 108 Stat. 3386 (emphasis added).

In March of 1995, proposed regulations, including contract terms, for commercial item contracts were issued for comment. 60 Fed. Reg. 11,198-99 (1995). Proposed FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS clause, contained terms believed "consistent with customary commercial practice," and some concepts thought to "represent significant changes from standard Government practices to commercial practices." Terms set forth included: inspection/acceptance;

assignment; changes; disputes; excusable delays; invoicing; patent indemnity; taxes, payment; risk of loss; title; warranty; limitation of liability; compliance with laws; and both termination for cause and for the convenience of the government. The latter term provided:

> The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience.... Subject to the terms of this contract, the Contractor shall be paid a reasonable termination charge considering the percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, **plus actual direct costs that the Contractor can demonstrate have resulted from the termination**. The Contractor shall not be paid for any work done after receipt of the termination notice, nor for any costs incurred by the Contractor's suppliers or subcontractors which the Contractor could reasonably have avoided.

60 Fed. Reg. 11,215-16 (emphasis added). Effective 1 October 1995, final regulations specifying solicitation provisions and contract clauses for commercial item contracts were promulgated. 60 Fed. Reg. 48,206 (1995). The revised convenience termination term, paragraph l of FAR 52.212-4, provided in pertinent part:

> (l) *Termination for the Government's convenience.* The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience.... Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, **plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records.** The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

60 Fed. Reg. 48,254 (emphasis added).

About four months later, during February 1996, Congress enacted the National Defense Authorization Act for Fiscal Year 1996, Pub. L. No. 104-106, 110 Stat. 186,

containing additional acquisition reform provisions: Division D (Federal Acquisition Reform Act of 1996 (FARA)) and Division E (Information Technology Management Reform Act (ITMRA)). Congress subsequently designated these two divisions as the "Clinger Cohen Act of 1996" (CCA). Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 808, 110 Stat. 3009, 3009x393 (1996). The CCA was designed to remove what were perceived as further impediments to the acquisition of commercial items. O'Sullivan & Perry, *Commercial Item Acquisitions*, 97 Briefing Papers 5 at 3, 8-9; John J. Pavlick, Jr., & Thomas J. Madden, *Procurement Reforms of the FY 1996 Defense Authorization Act*, 96 Briefing Papers 6 at 3. While TINA always provided an exception to offerors from providing cost or pricing data when an offered price was based on "established catalog or market prices of commercial items sold in substantial quantities to the general public" (10 U.S.C. § 2306a) and FASA (108 Stat. 3278) made changes with respect to existing exemptions to avoid TINA applicability to commercial item contractors, CCA removed any doubt about the non-applicability of TINA by creating a blanket exemption for commercial item procurements (§ 4201, 110 Stat. 649-52). The CCA also expressly exempted commercial item contracts and subcontracts from application of Cost Accounting Standards issued under 41 U.S.C. § 422 (§ 4205, 110 Stat. 656) and eliminated various statutory certification requirements (§ 4301, 110 Stat. 656-58).

## DECISION

This appeal concerns the proper construction of FAR 52.212-4(l) – the standard termination for convenience clause set forth in commercial item contracts. The Army asserts that we are bound to follow the Board's initial interpretation of that provision set forth in *Red River Holdings, LLC*, ASBCA No. 56316, 09-2 BCA ¶ 34,304, even though the decision in that appeal was reversed in part and remanded by the United States District Court of Maryland, *Red River Holdings, LLC v. United States*, 802 F. Supp. 2d 648 (2011). According to the Army, we need not follow the interpretation of FAR 52.212-4 set forth by the district court because "[p]recedential laws in non-maritime cases" before the Board, such as this appeal, "are decisions of the Board and [the United States Court of Appeals for the] Federal Circuit." The Army states that, as a result, "of the two *Red River* decisions [issued], the only binding precedential decision is the Board decision." (Gov't br. at 67; gov't resp. at 7-8) SWR, however, asserts that the Army's reliance on the Board's decision in *Red River* "is untenable" because the decision "was directly reversed on appeal"; the decision therefore "has no precedential value"; the district court decision "is the law of that case"; and "[i]t cannot possibly be that the Board's decision in *Red River* does not control in that case but is binding in this one" (app. reply br. at 9). According to SWR, the district court's decision "should control in cases brought under the comprehensive scheme of the [Contract Disputes Act]" (*id.* at 10-11). SWR, however, further asserts that the district court in *Red River* "was incorrect…in denying recovery of profit under the second prong" of FAR 52.212-4(l), the district court's limitation on recovering profit is inconsistent with the mandate of FASA, and SWR should receive an award of

profit under the second prong of FAR 52.212-4(l) contrary to the district court decision (app. br. at 30, 33, 38-40; app. reply br. at 26).

I. Binding Precedent

Under the Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, 96 Stat. 25, Congress split the trial and appellate functions of the United States Court of Claims, creating respectively two new courts – the United States Claims Court (now Court of Federal Claims, 28 U.S.C. § 171 note) and United States Court of Appeals for the Federal Circuit. The latter adopted as "binding precedent" decisions of the Court of Claims and its other predecessor, the United States Court of Custom and Patent Appeals, *South Corp. v. United States*, 690 F.2d 1368 (Fed. Cir. 1982) (en banc), as well as decisions issued by panels of the new Circuit, unless and until such a decision was overturned by the appellate court en banc, *see, e.g., AINS, Inc. v. United States*, 365 F.3d 1333, 1341 (Fed. Cir. 2004).

Pursuant to the Contract Disputes Act of 1978 (CDA), Pub. L. No. 95-563, 92 Stat. 2383, codified at 41 U.S.C. §§ 7101-7109, which Congress enacted to establish a "fair, balanced, and comprehensive statutory system of legal and administrative remedies in resolving government contract claims," S. Rep. No. 1118, 95th Cong., 2d Sess. 1, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5235, after a CO issues a final decision upon a contract claim, a contractor can elect to appeal that decision to the Court of Federal Claims, 41 U.S.C. § 7104(b), or an appropriate agency board of contract appeals, 41 U.S.C. §§ 7104(a), 7105. The contractor (or government) can later elect to appeal any adverse decision issued on the claim by one of those tribunals to the Court of Appeals for the Federal Circuit, 28 U.S.C. §§ 1295(a)(3), (a)(10), (b); 41 U.S.C. § 7107. An exception exists, however, for maritime contract claims. The Court of Federal Claims and Court of Appeals for the Federal Circuit both lack jurisdiction to entertain CDA claims arising from maritime contracts. Congress desired to retain such claims within the jurisdiction of the district courts, consistent with practice prior to the CDA (*see, e.g., Northwest Marine Iron Works v. United States*, 493 F.2d 652, 653, 656 (Ct. Cl. 1974) (appeal from ASBCA under Wunderlich Act, 41 U.S.C. § 322)). It stated expressly in the CDA, 41 U.S.C. § 7102(d), that suits arising out of maritime contracts shall be governed by the Suits in Admiralty Act or Public Vessels Act, as applicable, which require suit be brought in district court. Accordingly, when a maritime contract is at issue, a contractor can elect to appeal a CO's final decision to a district court or to an agency board of contract appeals (with appellate review of the board's decision by a district court, if necessary). *Dalton v. Southwest Marine, Inc.*, 120 F.3d 1249, 1251 (Fed. Cir. 1997); *Southwest Marine of San Francisco, Inc. v. United States*, 896 F.2d 532 (Fed. Cir. 1990); *Whitey's Welding & Fabrication, Inc. v. United States*, 5 Cl. Ct. 284 (1984); *Southwest Marine, Inc. v. United States*, 680 F. Supp. 1400, 1402 (N.D. Cal. 1988).

31

We have stated that we look to Federal Circuit precedent for guidance in matters within its jurisdiction. *Armentrout Constr., Inc.*, ASBCA No. 29118, 84-2 BCA ¶ 17,263 at 85,964 n.1. Since decisions of the Court of Claims constitute "binding precedent" for the Circuit, we additionally adhere to those decisions. *E.L. Hamm & Assocs., Inc.*, ASBCA No. 43972, 94-2 BCA ¶ 26,724; *Titan Atlantic Constr. Corp./The Gallegos Corp.*, ASBCA No. 26007, 83-2 BCA ¶ 16,791. Moreover, a prior decision by a panel of this Board is deemed "binding precedent" in another ASBCA appeal unless the decision has been reversed or otherwise modified by the Board's Senior Deciding Group or our appellate authority. *PCA Health Plans of Texas, Inc.*, ASBCA No. 48711, 98-2 BCA ¶ 29,900 at 148,014, *aff'd*, 191 F.3d 1353 (Fed. Cir. 1999).

In *Red River*, which involved a maritime contract, this Board held the FAR 52.212-4(l) convenience termination clause for commercial item contracts did not allow contractor recovery of "costs reasonably incurred in anticipation of performing the Contract" or "solely for the purpose of contract performance," such as insurance premiums and other costs related to the final two months of a vessel charter. 09-2 BCA ¶ 34,304 at 169,455, 169,457. We construed the "reasonable charges" resulting from termination that could be reimbursed under the second part of the third sentence of the termination clause as "charges in the nature of settlement expenses." *Id.* at 169,456. We stated "[t]he conceptual basis of the commercial item clause is wholly different from the FAR 52.249-2 non-commercial item termination for convenience clause, which effectively converts fixed-price contracts to cost-reimbursable contracts for purposes of [recovery of] termination costs." *Id.* The contractor sought review of our decision in a district court, which set forth a differing interpretation of FAR 52.212-4(l), reversed our decision in relevant part, and remanded for further proceedings in accordance with its interpretation. *Red River*, 802 F. Supp. 2d at 648. The district court found FAR 12.403 and 52.212-4 to be "ambiguous with respect to precisely how they modified the termination-for-convenience provisions applicable to government contracts generally." *Id.* at 655. After examining FASA and legal precedent indicating that the purpose of a termination for convenience settlement is to "fairly compensate" the contractor, it held that FAR 52.212-4 entitles a commercial items contractor whose contract is terminated for convenience to:

> (1) [The] payment of "a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination"; and (2) a payment as compensation for settlement costs or costs *reasonably incurred in anticipation of contract performance, provided such costs are not adequately reflected as a percentage of the work performed*, and *provided such costs could not have been reasonably avoided.*

*Red River*, 802 F. Supp. 2d at 662 (footnotes omitted).

The district court's decision in *Red River* constituted the law of the case in that particular appeal, which was to be followed by this Board on remand. Under the law of the case doctrine, a decision of a legal issue by an appellate court establishes the "law of the case" and must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court, unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice. *Gindes v. United States*, 740 F.2d 947, 950 (Fed. Cir. 1984); *United States v. Turtle Mountain Band of Chippewa Indians*, 612 F.2d 517, 520-21 (Ct. Cl. 1979); *Southwest Marine, Inc.*, ASBCA No. 54550, 08-1 BCA ¶ 33,786 at 167,221. "It is 'familiar doctrine that a lower court is bound to respect the mandate of an appellate tribunal and cannot reconsider questions which the mandate has laid to rest.'" After an appellate court has decided a case and remanded to a lower tribunal, the latter "is bound by the decree as the law of the case; and must carry it into execution." *Northern Helex Co. v. United States*, 634 F.2d 557, 560 (Ct. Cl. 1980), *cert. denied*, 429 U.S. 866 (1976). After remand in *Red River*, this Board therefore was required to follow the district court's interpretation of FAR 52.212-4 in any further proceedings in "that appeal." The *Red River* appeal, however, was resolved amicably by the parties on remand and dismissed from the Board's docket without the issuance of any further decisions by the Board.

Neither our decision in *Red River* initially construing FAR 52.212-4(l), the convenience termination clause for commercial item contracts, nor the decision on appeal in *Red River* of the district court which sets forth a differing interpretation of that clause, constitutes precedent that is "binding" in this appeal. The relevant part of our *Red River* decision was reversed during appellate review and thereby effectively vacated. *Red River*, 802 F. Supp. 2d at 648. As discussed above, while the district court's decision in *Red River* was binding on this Board under the law of the case doctrine for further proceedings in the *Red River* appeal, it does not constitute legal precedent "binding" on the panel in this appeal. District court decisions are not "binding" precedent on other district court judges resolving CDA maritime claims. "[T]he opinion of one district court is entitled only to comity in another district court." *E.g.*, *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1570 (Fed. Cir. 1993). Similarly, this Board does not consider a district court decision to be precedent "binding" on it if the decision was issued in an appeal other than the one currently before the Board. The Board is bound by decisions of the United States Court of Appeals for the Federal Circuit, the court that Congress has selected as the Board's appellate authority in the majority of CDA appeals, and of the Circuit's predecessor court, the Court of Claims, which have been adopted by the Circuit as precedent. *See E.L. Hamm & Assocs.*, 94-2 BCA ¶ 26,724 at 132,940; *Marine Hydraulics Int'l, Inc.*, ASBCA No. 42509, 92-3 BCA ¶ 25,156 at 125,397; *Armentrout Constr.*, 84-2 BCA ¶ 17,263 at 85,964 n.1; *Titan Atlantic Constr. Corp./The Gallegos Corp.*, 83-2 BCA ¶ 16,791 at 83,471.

## II. Interpretation of FAR 52.212-4(l)

Since there is no binding precedent with respect to the issues here regarding the proper interpretation of the convenience termination clause for commercial item contracts, FAR 52.212-4(l), we must determine for ourselves the construction we believe to be controlling. The clause at issue, FAR 52.212-4(l), states "[t]he Government reserves the right to terminate this contract, or any part hereof, for its sole convenience." Both of the parties agree that this sentence means what it says – the government has the right to terminate a commercial items contract (in whole or in part) for its convenience. The parties also agree that, if the government terminates a commercial items contract for convenience, the termination clause's third sentence provides, subject to the contract terms, the government shall pay a contractor: (1) a "percentage of the contract price reflecting the percentage of work performed prior to [the] notice of termination" and (2) "reasonable charges" that the contractor "can demonstrate to the satisfaction of the Government using its standard record keeping system have resulted from the [contract] termination." (*See* app. br. at 33; gov't resp. at 4) The parties, however, disagree on what both prongs (1) and (2) of the third sentence mean. SWR argues that, under the first prong, it can seek "the pro-rata portion of the per-month unit price" of a CLIN for "work performed prior to the Notice of Termination" (app. br. at 34). The Army asserts its CO "never issued a single delivery order for...services under the contract" and SWR is, therefore, barred from recovering any monies under the first prong because SWR "performed no services under the contract" (gov't br. at 68). With respect to the second prong, SWR argues "reasonable charges" include costs incurred prior to a termination when the costs cannot be amortized over the life of the contract, such as the cost of preparations and reasonable profit thereon (app. br. at 34-35). The Army asserts that "reasonable charges" are "settlement expenses" and nothing more (gov't br. at 82, 90).

We begin with our own examination of the FAR's language. We construe a clause in the same manner that we construe a statute. *Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, 1346-47 (Fed. Cir. 2005). We look at the clause's "plain language" and consider the terms in accord with their common meaning. *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997); *Ingalls Shipbuilding, Inc. v. Dalton*, 119 F.3d 972, 976 (Fed. Cir. 1997); *Whelan v. United States*, 529 F.2d 1000, 1002-03 (Ct. Cl. 1976) (the plain meaning rules of statutory construction apply to interpretation of Executive Branch regulations). While the parties focus their interpretation of FAR 52.212-4(l) upon the series of words comprising each separate prong or component of the third sentence of the clause, we construe the regulation as a whole. In construing a FAR clause, we examine the text of the entire clause, reconciling the section in question with other sections related to it. *Lengerich v. Dep't of Interior*, 454 F.3d 1367, 1370 (Fed. Cir. 2006); *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1577 (Fed. Cir. 1995) (en banc) (proper interpretation "examines and reconciles the text of the entire regulation, not simply isolated sentences"); *accord Beecham v. United States*, 511 U.S. 368, 372 (1994) (we seek to discern the plain meaning of the

whole, not of isolated sentences). When interpreting the language of a FAR clause, we must read the language in the context of the entire clause, as well as other related regulatory sections, in order to determine the language's plain meaning. *Vazquez-Claudio v. Shinseki*, 713 F.3d 112, 115 (Fed. Cir. 2013). We therefore must consider the third sentence of FAR 52.212-4(l) in the context of the broader scheme. *Id.*; *Lengerich*, 454 F.3d at 1370.

The first sentence of FAR 52.212-4(l) states "[t]he Government reserves the right to terminate this contract, or any part hereof, for its sole convenience." This sentence conveys, by its plain language, that the government has the right to cancel the commercial items contract without incurring liability for anticipatory profit. While "termination of a contract for convenience" is not part of ordinary commercial law, *see, e.g.*, Marc A. Pederson, *Rethinking the Termination for Convenience Clause in Federal Contracts*, 31 Pub. Cont. L.J. 83, 95-96 (2001), as discussed above, it has been a major principle of "government" contract law for the past century. *G.L. Christian*, 312 F.2d at 426. At least since World War I, there regularly have been "convenience termination" provisions allowing for cancellation of defense contracts when they were not needed and providing for reimbursement of contractor costs actually incurred prior to cancellation, plus the payment of a reasonable profit on the work performed. *G.L. Christian*, 320 F.2d at 355 (the familiar, established phrase "termination for convenience" has been well understood to be a cancellation which was authorized by contract and would not constitute a breach) (citing *United States v. Penn Foundry & Mfg. Co.*, 337 U.S. 198, 214-16 (1949) (opinion of Justice Douglas)).

A convenience termination clause is intended to enable a CO to stop or curtail a contractor's performance without involving the government in a breach that would render it liable for the contractor's anticipatory profits. *Torncello*, 681 F.2d at 759 (plurality); *Dairy Sales Corp. v. United States*, 593 F.2d 1002, 1005 (Ct. Cl. 1979); *G.C. Casebolt Co. v. United States*, 421 F.2d 710, 713 (Ct. Cl. 1970). It has been said that the "only substantial difference between the sums recoverable by a contractor under a convenience termination provision of a government contract and the sums recoverable in a common-law action for [a] contract breach is the non-inclusion in the former of anticipated but unearned profits." *William Green Constr. Co. v. United States*, 477 F.2d 930, 935 (Ct. Cl. 1973), *cert. denied*, 417 U.S. 909 (1974). In allocating to a contractor a share of the risk of changed circumstance concerning the government's continuing need or desire for the items being procured, there is a *"quid pro quo."* Under clauses which authorize convenience terminations, the government is able to cancel or curtail its contract in exchange for the contractor being able to recover from it administratively sums the contractor may have been able to recover in a contract "breach action," except for profits that were anticipated and unearned. *See Maxima Corp. v. United States*, 847 F.2d 1549, 1552-53 (Fed. Cir. 1988); *Systems & Computer Information, Inc.*, ASBCA No. 18458, 78-1 BCA ¶ 12,946 at 63,138 (sovereign's unique right to terminate for convenience is premised upon a fair administrative settlement). The recovery received administratively by a contractor

terminated for convenience is commonly referred to as a "termination settlement." *See, e.g., James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1543-44 (Fed. Cir. 1996).

The overall purpose of a termination for convenience settlement is to fairly compensate the contractor and to make the contractor whole for the costs incurred in connection with the terminated work. *Nicon, Inc. v. United States*, 331 F.3d 878, 885 (Fed. Cir. 2003). "A contractor is not supposed to suffer as the result of a termination for convenience of the Government, nor to underwrite the Government's decision to terminate." *Jacobs Eng'g Group, Inc. v. United States*, 434 F.3d 1378, 1381 (Fed. Cir. 2006) (quoting *Kasler Elec. Co.*, DOT CAB No. 1425, 84-2 BCA ¶ 17,374 at 86,566). A convenience termination settlement should compensate the contractor fairly for the work done and normally includes a reasonable allowance for profit. *General Dynamics Land Sys., Inc.*, ASBCA No. 52283, 02-1 BCA ¶ 31,659 at 156,411; *Ralcon, Inc.*, ASBCA No. 43176, 94-2 BCA ¶ 26,935 at 134,140.

The third sentence of FAR 52.212-4(l), in its entirety, provides:

> Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination.

When this sentence is read in context with the initial sentence of FAR 52.212-4(l), which furnishes the government the right to terminate the contract for its convenience, it is clear the language of the third sentence sets forth a procedure or process for the government to compensate fairly a contractor whose contract has been terminated for convenience. *See Vazquez-Claudio*, 713 F.3d at 115. The first prong of the sentence providing for payment to the contractor of "a percentage of the contract price reflecting the percentage of work performed" prior to the termination notice, by its plain language, specifies a means for compensating the contractor for the work it has done before termination. The second prong of the sentence providing for payment to the contractor of "reasonable charges" the contractor can "demonstrate" "have resulted from the termination," when read in conjunction with the first prong of the sentence relating to recovery for work completed, refers to the recovery of those charges incurred that "do not relate to work completed" but should be reimbursed to fairly compensate the contractor whose contract has been terminated.

This interpretation of the second prong of the third sentence of FAR 52.212-4(l) is supported by the language of related termination for convenience clauses. *See Vazquez-Claudio*, 713 F.3d at 115 (regulation language must be read in the context of

36

related regulatory sections). FAR 52.212-4(l) has been referred to by some commentators as a "short form" termination clause because it sets forth a concise process or means by which a contractor whose contract has been terminated receives compensation. *See, e.g.*, Ralph C. Nash & Paul J. Seidman, *Postscript: Termination for Convenience of FAR Part 12 Commercial Item Contracts*, Vol. 25, No. 8, NASH & CIBINIC REPORT ¶ 37 (2011). The FAR instruction (FAR 49.502(c)) for another termination clause commonly referred to as "short form" (FAR 52.249-4) also uses the term "charges" with no definition of that word. This Board, and others, have construed the word "charges" with respect to that short form convenience termination clause as referring to: start-up costs; unrecovered running expense; preventive maintenance; settlement charges; and other charges that are normally paid pursuant to a long form termination for convenience clause to fairly compensate a contractor. *Carrier Corp.*, 90-1 BCA ¶ 22,409 at 112,557; *Am. Maint. and Mgmt. Servs.*, 76-2 BCA ¶ 11,960 at 57,341; *Trans-Student Lines*, 75-1 BCA ¶ 11,343, at 54,027; *American Packers*, 71-1 BCA ¶ 8846 at 41,128. Both the Court of Claims and Federal Circuit have held that a reasonable and consistent government interpretation is to be given great weight. *Santa Fe Engineers, Inc. v. United States*, 801 F.2d 379, 381 (Fed. Cir. 1986); *Honeywell, Inc. v. United States*, 661 F.2d 182, 186 (Ct. Cl. 1981).

Sentences four and five of FAR 52.212-4(l) also support our interpretation of the third sentence of that clause. *See Lengerich*, 454 F.3d at 1370; *Reflectone*, 60 F.3d at 1578 (proper interpretation reconciles text of entire regulation). They provide:

> The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records.

FAR 52.212-4(l). These sentences, by their plain language, provide in ascertaining fair or just compensation due a commercial item contractor under the third sentence, a commercial items contractor need not comply with regulatory cost principles or CAS, or undergo a government audit. *See* FAR 12.403(d)(ii). As discussed above, over the years, various methods have been used to ascertain fair or just compensation due a contractor whose contract has been terminated for convenience. *E.g., Itek Corp.*, 60-2 BCA ¶ 2673; Contract Settlement Act of 1944, 58 Stat. at 652; Dent Act, 40 Stat. at 1272-73; The Urgent Deficiency Appropriation Act, 40 Stat. at 183; *Davis Sewing Machine*, 60 Ct. Cl. at 203. For the last six decades or so, the government has used the inventory and total cost bases for ascertaining fair compensation for a fixed-price, non-commercial items contractor. *E.g.*, FAR 49.206-2; 17 Fed. Reg. 1798 (1952). As a result, when a contract was terminated for convenience, it essentially became a "cost reimbursement" contract providing for recovery in accordance with government-unique cost principles. *D.E.W., Inc. and D.E. Wurzbach, A Joint Venture*, ASBCA Nos. 50796, 51190, 00-2 BCA ¶ 31,104 at 153,632; *Durette, GmbH*, ASBCA No. 34072, 91-2 BCA ¶ 23,756 at 118,972; *R.G. Robbins & Co.*, ASBCA No. 27516, 83-1 BCA ¶ 16,420 at 81,691-92;

37

*accord Praecomm, Inc. v. United States*, 78 Fed. Cl. 5, 11 (2007), *aff'd*, 296 F. App'x 929 (Fed. Cir. 2008). The contract's "price" therefore did not have the same significance it had prior to contract termination. Due to the termination, the contractor was entitled to receive its "costs" of performing the work terminated, not its "price." *Systems & Computer Information*, 78-1 BCA ¶ 12,946; *Atlantic, Gulf & Pacific Co. of Manila, Inc.*, ASBCA No. 13533, 72-1 BCA ¶ 9415 at 43,738, *aff'd on recon*, 72-2 BCA ¶ 9698. This necessitated application of unique government cost principles and often a government audit. *See* FAR 31.205-42; FAR 49.206-2; *R.G. Robbins*, 83-1 BCA ¶ 16,420 at 81,688-89. The Section 800 Report (which precipitated FASA), FASA (which directed the promulgation of FAR 52.212-4(l)), and the CCA all sought to eliminate application of government-unique accounting and audit principles to commercial item contractors. FASA, 108 Stat. 3278; CCA, 110 Stat. 649-52, 656; Acquisition Law Advisory Panel, *Streamlining Defense Acquisition Laws* at 8-5 to 8-7. Those drafting the FAR sought to comply with Congress' intent regarding commercial item contracting and expressly specified in the FAR such provisions not be applied in ascertaining fair or just compensation for a convenience termination, contrary to prior government practice. FAR 12.403(d)(ii), 52.212-4(l). The regulators specified instead that recovery for work performed prior to termination be calculated based on contract price, i.e., as a percentage of contract price reflecting percentage of work performed prior to notice of termination, and that recovery with respect to the remainder, i.e., work not performed, be "reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the [convenience] termination," thereby differing from the methods of determining fair compensation set forth in termination for convenience clauses prescribed in FAR Part 49. FAR 12.403(a), 12.403(d), 52.212-4(l).

In sum, the third sentence of FAR 52.212-4(l) simply sets forth a more simple, straightforward method of ascertaining fair compensation where a commercial items contract has been terminated for convenience than convenience termination clauses used for other government contracts to induce commercial item contractors to offer their wares to the government without fear that they may have to alter their general methods of doing business. There is nothing in the language of FAR 52.212-4(l), or its authorizing statute, FASA, directing or suggesting deviation from the long-established rule of providing just or fair compensation to contractors who have had their contracts curtailed by the government under a convenience termination provision.

III. SWR's Convenience Termination Claim

In its post-trial briefs, SWR has modified the claim submitted to the TCO on 29 June 2007 based upon the Army's termination of its 0013 Contract for the Army's convenience to: eliminate fabric structure transportation and storage costs of $230,611; reduce the cost of the fabric structures sought from $5,250,000 to $2,867,500; reduce the cost of work performed under CLIN AA from $215,314.63 for one month's rental/lease of property to $157,897.30 representing the CLIN AA

38

monthly per unit price prorated for the period of 6 April 2006 (contract award) to 27 April 2006 (stop work order); and alter the amount of attorney fees sought as settlement expenses from $13,163.35 to $11,591.41 (app. br. at 29, 32-33; app. reply br. at 18, 25-26). To date, the Army has paid SWR no convenience termination costs. In its post-trial briefs, the Army asserts SWR is entitled to recover "at most" $8,778 in attorney fees (comprising "settlement expenses") as a result of termination of SWR's 0013 Contract for the Army's convenience (gov't br. at 110; gov't resp. at 19).

A contractor bears the burden of proving by a preponderance of the evidence that it is entitled to a greater termination settlement amount than that determined by the TCO. *General Dynamics Land Sys.*, 02-1 BCA ¶ 31,659 at 156,411; *Unified Eng'g, Inc.*, ASBCA No. 21565, 81-1 BCA ¶ 14,940 at 73,936. It is well established that the contractor "bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of [its] loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed. Cir. 1987) (quoting *Willems Indus., Inc. v. United States*, 295 F.2d 822, 831 (Ct. Cl. 1961)), *cert. denied*, 370 U.S. 903 (1962).

## A. Prong No. 1 – Work Performed

Initially, SWR seeks $157,897.30 as a pro-rated payment for April 2006 under 0013 Contract CLIN AA, which was the line item for rental/lease of property at a monthly unit price of $215,314.63. According to SWR, its request for payment under CLIN AA "is for work performed" before the stop work order and subsequent convenience termination, i.e., from 6 April 2006 (contract award) until 27 April 2006 (Army issuance of stop work order) (app. br. at 29; app. reply br. at 25-26). SWR suggests its performance of work under CLIN AA began 6 April 2006, the date of contract award (app. reply br. at 13-14).

There are two legal obstacles, however, to SWR's claim for work performed under CLIN AA. The first is that SWR's 0013 Contract was a requirements contract for services specifying that "performance shall be made only as authorized by orders issued in accordance with the Ordering clause" (FAR 52.216-21(b)) and that clause provided "services to be furnished under this contract shall be ordered by issuance of delivery orders…by individuals or activities designated." FAR 52.216-18(a). The Army's CO never issued any delivery order for services under CLIN AA so there were no services or work under the CLIN that SWR could have been performing for the Army. We note the base period for the 0013 Contract commenced 1 June 2006 and SWR was to receive 30-days notice of arrival of any POVs so there should have been no expectation on the part of SWR of providing rental/lease of property for storage of POVs to the Army during April 2006.

39

The second legal obstacle to SWR's claim of $157,897.30 under CLIN AA for rental/lease services is that SWR entered into a settlement agreement with Pineridge Farms, the lessor of the land where SWR intended to perform the 0013 Contract, whereby SWR states that it agreed to pay Pineridge Farms a total of $15,000 to release it from its legal obligations related to lease/rental of the land where deployed service members' POVs were to be stored. SWR also seeks reimbursement of that $15,000 sum here. (App. br. at 27, 32-33; app. reply br. at 25-26) (We address SWR's claim for $15,000 below under the second prong of FAR 52.212-4(l)). SWR essentially is seeking to recover for cost of subcontractor lease/rental both indirectly (via payment under a CLIN for work performed) and directly (as a direct cost incurred as a result of the termination). A contractor cannot recover twice for the same cost. *See, e.g., Allied Materials and Equipment Co.*, ASBCA No. 17318, 75-1 BCA ¶ 11,150, at 53,088 (preparatory expenses and costs of leasehold improvements treated as direct costs for purposes of termination could not also be included in overhead); *American Electric, Inc.*, ASBCA No. 16635, 76-2 BCA ¶ 12,151 at 58,471 (where indirect overhead expense is treated as direct expense after a convenience termination it cannot be recovered as an indirect overhead expense); *accord* FAR 31.205-42(c)(3).

In sum, this is one of those unique cases commentators have postulated in support of their criticism of the *Red River* district court's characterization of the second prong of FAR 52.212-4(l) as simply a "safety valve." *See* Nash & Seidman, *Postscript: Termination for Convenience of FAR Part 12 Commercial Item Contracts*, Vol. 25, No. 8, NASH & CIBINIC REPORT ¶ 37 (unfair compensation may result from unnecessary language indicating recovery for reasonable charges resulting from termination under second prong is limited and not subject to an award of profit), (citing *Red River*, 802 F. Supp. 2d at 662, n.18). In the appeal before us, there can be no recovery under the first prong of FAR 52.212-4(l) because the Army terminated the contract for convenience before work was performed under that contract. The contractor therefore is limited by the plain language of the convenience termination clause to recovery under the second prong of the third sentence of FAR 52.212-4(l), which here will be the basis for the just or fair compensation that the contractor is entitled to receive.

B. Prong No. 2 – Reasonable Charges
Resulting From Convenience Termination

1. Pineridge Farms Lease Settlement

SWR asserts it entered into a lease with Pineridge Farms for property where SWR planned to have the fabric structures erected to store deployed service members' POVs, and Pineridge Farms began site preparation work for 0013 Contract performance after notice of contract award by crushing on-site rock and concrete debris for spreading as a gravel surface for stored POVs (app. br. at 17-18). SWR, however, later "negotiated its way out" of this lease, by agreeing to pay Pineridge

Farms $15,000, which constituted expenses Pineridge Farms incurred for engineer's fees in obtaining permits for SWR to use the property, and equipment and labor charges associated with site preparation work (app. br. at 27). SWR seeks recovery of the $15,000 it contends it is obligated to pay Pineridge Farms.

The Army asserts SWR is not entitled to recover the charges because it never showed it paid $15,000 to Pineridge Farms or that the charges claimed and invoiced by Pineridge Farms were actually "incurred" by Pineridge Farms. The Army further asserts, that even if SWR had made such showings, the charges sought are precluded under the second prong of the third sentence of FAR 52.212-4 because they arose "in advance of the termination date" and "cannot be said to logically result" from the "later" contract termination, citing our decision in *Red River* which the Army acknowledges was reversed. (Gov't br. at 67, 86-88)

While the Army faults SWR for not having paid the $15,000 to Pineridge Farms, "actual payment" need not occur. The incurrence of an obligation to pay is sufficient for purposes of recovery after a termination for convenience. The term "charge" in FAR 52.212-4(l) "means '[an] expenditure or incurred expense.'" *Individual Dev. Assocs., Inc.*, ASBCA Nos. 55174, 55188, 06-2 BCA ¶ 33,349 at 165,369 (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (UNABRIDGED) 377 (8th ed. 1986)); *accord Norman M. Giller & Assocs. v. United States*, 535 F.2d 37, 41 (Ct. Cl. 1976); *Mountain Plains Educ. and Econ. Dev. Program, Inc*, ASBCA No. 21714, 78-1 BCA ¶ 13,083 at 63,919.

Moreover, while the Army further faults SWR for not demonstrating its lessor, Pineridge Farms, actually incurred $15,000 in charges for site work and engineering fees, the claim presented by SWR is not for site work and engineering fees. Rather, it is a claim for charges SWR incurred settling a lease or subcontract due to Army termination of SWR's prime contract. The record here contains documentation generated by both SWR and the Army showing (a) SWR was leasing real property in Hawaii from Pineridge Farms to perform the vehicle storage contract and (b) Army personnel visited that site observing site conditions and efforts the Army clearly deemed necessary to prepare that site for use under the 0013 Contract, which set forth a per month payment of $215,314.63 for property rental/lease under CLIN AA. SWR presented in this appeal a November 2006 invoice from Pineridge Farms for the $15,000 in charges it agreed to pay to settle legal obligations it owed Pineridge Farms under the lease. Since rental costs under unexpired leases usually are allowed as termination costs, *see, e.g., Info. Sys. & Networks Corp.*, ASBCA No. 46119, 02-2 BCA ¶ 31,952 at 157,876, SWR's incurrence of a $15,000 charge to cancel or curtail the Pineridge Farms lease was for the benefit of the Army and resulted in a significant reduction in termination costs. *See Lockheed Aircraft Corp. v. United States*, 375 F.2d 786, 794-95 (Ct. Cl. 1967); *DeLong v. United States*, 175 F. Supp. 169, 175 (Ct. Cl. 1959). The agreement to pay Pineridge Farms one payment of $15,000 to avoid a lease termination penalty of $35,000 or monthly rental payments, which CLIN AA suggests likely

41

exceeded $100,000 each, clearly was both prudent and reasonable. *See, e.g., Bos'n Towing and Salvage Co.*, ASBCA No. 41357, 92-2 BCA ¶ 24,864 at 124,031; *General Electric Co.*, ASBCA No. 24111, 82-1 BCA ¶ 15,725 at 77,806, *recon. denied*, 83-1 BCA ¶ 16,207; FAR 31.205-42(e)(2); *see also* FAR 12.403(a) (FAR Part 49 may be used as a guide if principles are not in conflict with FAR Part 12). Thus, under the second prong of the third sentence of FAR 52.212-4(l), SWR has demonstrated using its standard record keeping system it incurred a "reasonable" charge of $15,000 to end its lease with Pineridge Farms as a result of the Army's convenience termination of the 0013 Contract.

Relying on our decision in *Red River*, 09-2 BCA ¶ 34,304, which was reversed, the Army maintains that, even if such a showing has been made, SWR cannot recover the charges because they arose "in advance of the termination date" and, as a matter of law, "cannot be said to logically result" from the "later" contract termination. As discussed at length above, after extensive review of FAR 52.212-4(l), the case law concerning convenience terminations, and the statutory and regulatory framework for such terminations, we have concluded that our initial interpretation of the second prong of the third sentence of FAR 52.212-4(l) set forth in the *Red River* decision, which was effectively vacated by the district court's reversal and is not now binding on us, was incorrect. We construe the third sentence of FAR 52.212-4(l) as simply setting forth a more simple, straightforward method or process for ascertaining fair compensation for a commercial items contract terminated for the government's convenience. Nothing in the language of FAR 52.212-4(l), or its authorizing statute, FASA, directs or suggests any deviation from the long-established rule of providing just or fair compensation to contractors who have had their contracts curtailed by the government under a convenience termination provision. The second prong of the third sentence, when read in the context of related clauses, refers to the recovery of unavoidable, reasonable charges incurred other than those relating to contract work completed (which was addressed under the first prong) that should be paid to fairly or justly compensate a contractor whose contract has been terminated.

When the drafters of procurement regulations desire to limit or restrict recovery in a convenience termination, they know how to do so. A "short form" termination for convenience clause (for inclusion in service contracts) provides for no recovery other than for services rendered. *Trans-Student Lines*, 75-1 BCA ¶ 11,343 at 54,027, *aff'd on recon.*, 75-2 BCA ¶ 11,419 at 54,348; *Guard-All of America*, 79-1 BCA ¶ 13,874 at 68,066. The clause, however, is to be used only if it has been reasonably determined that termination for convenience would not result in a claim for anything but the services rendered. FAR 52.249-4, TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (SERVICES) (SHORT FORM) (APR 1984); ASPR 7-1902.16(b) and 8-705.1(b); *see, e.g., Laboratory Systems Services*, 95-1 BCA ¶ 27,527 at 137,196. The second prong of the third sentence of FAR 52.212-4(l) contains no language limiting or restricting compensation where a contract has been terminated to payment essentially for services rendered. We decline to read such language into the clause

where it now does not exist. *Victory Constr. Co. v. United States*, 510 F.2d 1379, 1386 (Ct. Cl. 1975) (reading into regulation a totally unarticulated procurement policy amounts to impermissible overreaching).[3]

In sum, relying upon both its own standard record keeping system and Army records, SWR has demonstrated it incurred an unavoidable "reasonable" charge of $15,000 to end its land lease with Pineridge Farms as a result of the Army's convenience termination of the 0013 Contract. It thus is entitled to recovery of that sum under the second prong of the third sentence of FAR 52.212-4(l).[4]

## 2. $75,000 Payment to FES

SWR asserts the $75,000 check it issued to FES during April 2006 is an "unreimbursed charge directly allocable to...[the 0013] contract" (app. reply br. at 23). In its briefs, SWR characterizes the 13 April 2006 check as a "deposit" for fabric structures (app. br. at 18).

The Army asserts that it is unclear from the face of the $75,000 check that it is allocable to this contract. According to the Army, based on its timing and amount, the

---

[3] The dissent states that the FAR "simply and unambiguously declares that, in addition to the percentage of the contract price reflecting the percentage of the work performed, a terminated commercial items contractor 'shall be paid...[a]ny charges the contractor can demonstrate directly resulted from the termination.'" It is well-settled that a tribunal is not to resort to the history of the drafting of a regulation, as the dissent does here, in construing an unambiguous regulation. If the language of a regulation is clear, we are bound to give effect thereto. *Manhattan Savings Bank v. United States*, 557 F.2d 1388, 1390 (Ct. Cl. 1977). When the words of a regulation are unambiguous, as the dissent states here, our inquiry is complete, except in rare circumstances. *See, e.g., Hall v. United States*, 677 F.3d 1340, 1346 (Fed. Cir. 2012) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)); *Norfolk Dredging Co. v. United States*, 375 F.3d 1106, 1110 (Fed. Cir. 2004) (we need not seek clarification if language is clear and unambiguous absent extraordinary circumstances); *Texas State Comm. for the Blind v. United States*, 796 F.2d 400, 406 (Fed. Cir. 1986) (en banc), *cert. denied*, 479 U.S. 1030 (1987). An exception arises only where the plain meaning produces a result "so bizarre" that the drafters "could not have intended it." *Weddel v. Dept. of Health & Human Services*, 23 F.3d 388, 391 (Fed. Cir. 1994). The dissent proffers no suggestion that the plain language of the FAR produces a "bizarre result."

[4] With respect to this claim, and other claims by SWR, we rely on records other than the contractor's own standard record keeping system, e.g., contemporaneous Army and SWR emails discussing the Pineridge Farms site lease.

check most likely relates to FES's purchase of three new 1,000 foot "FAST" tents from Aztec and is allocable to the Bridge Contract where SWR used those structures. (Gov't resp. at 16)

We found above based upon documents from SWR's standard record keeping system that the $75,000 check to FES was dated 13 April 2006, one week after award of the 0013 Contract and the same date SWR received a fabric structure quotation from Sprung, which SWR did not accept. We additionally found above, based on documents from the standard record keeping system of FES, "agent" or possible subcontractor of SWR, that FES deposited the SWR check on 19 April 2006 and the very next day, 20 April, obtained a cashier's check for $75,000 made out to Classic, a fabric structure company in the process of acquiring Aztec. Moreover, on 20 and 21 April 2006, at the cost of FES, Phoenix-PDQ shipped drayage from Aztec Tents of Torrance, California (the three new 1,000 foot long fabric structures) to the Los Angeles Harbor for transport to Hawaii. Thus, with respect to the $75,000 check, both SWR and FES acted before issuance of the Army's 26 April 2006 stop work order halting 0013 Contract performance. The $75,000 charge, therefore, was incurred for the 0013 Contract awarded 6 April 2006, not the Bridge Contract awarded 25 May 2006.

We further found above based upon documents from SWR's standard record keeping system that, in performing its 2004 POV contract, SWR executed a 13-page, 12-month lease to own for fabric structures requiring an upfront payment or deposit at the time of order of structures in a similar sum. Under that agreement, if the lease was terminated prior to shipment of the structures, the lessor could impose on the lessee a restocking fee of approximately $75,000. Based on this documentation, deposition testimony of the FES official dealing with both SWR and Aztec that the $75,000 check was a deposit on three new 1,000 foot long Aztec tents intended for use under the 0013 Contract, and the shipment of the new tents to the Harbor shortly after purchase, we conclude that the $75,000 charge was in the nature of a deposit on new tents to be used on the 0013 Contract. While the Army appears to contend SWR cannot recover this charge because the new tents ultimately were used on the Bridge Contract, it cites no legal support for that proposition. SWR is simply seeking here a "deposit" made prior to issuance of the stop work order and 0013 Contract termination. When leases or purchase arrangements are cancelled, deposits made are generally forfeited (and sometimes restocking fees imposed). We conclude from the record in this appeal that, as a result of the 0013 Contract convenience termination, SWR has incurred an unavoidable reasonable charge for a deposit of $75,000 in preparing to perform the 0013 Contract which it is entitled to recover. See FAR 12.403(c) (COs may continue to use FAR Part 49 as guidance to the extent that it does not conflict with FAR Part 12); FAR 49.201(a) (contractor should be compensated for preparations made for terminated portions of the contract); MIG Corp., ASBCA No. 54451, 05-2 BCA ¶ 32,979 at 163,385 (same).

44

### 3. Travel Expenses and Salary

SWR asserts that, during April 2006 prior to issuance of the Army's stop work order, its President, Mr. Swindall, incurred $3,123.69 in travel expenses in preparing to perform the terminated 0013 Contract (app. br. at 19, 28; app. reply br. at 26). As found above based on documents from SWR's standard record keeping system, Mr. Swindall travelled to Hawaii on 10 April 2006 to assist SWR's project manager with preparations for the 0013 Contract performance and attend a post-award conference with the Army on 17 April 2006, thereby incurring charges for his travel and subsistence. SWR further asserts that, during April of 2006, it incurred $3,588.64 in charges for wages of its full time project manager, Mr. King, who was preparing for performance of the 0013 Contract work by recruiting and interviewing employees, assisting with site preparation, making necessary arrangements with vendors, and attending the Army's post-award conference (app. br. at 19, 27). As found above, SWR checks and pay stubs show SWR paid Mr. King $1,786.24 for each of two pay periods – 1 April 2006 through 15 April 2006 and 16 April 2006 through 30 April 2006.

Relying again upon our decision in *Red River*, which was reversed, the Army asserts that "preparatory costs such as these are not allowable under [FAR] 52.212-4(l)." It asserts that a "contractor receives a percentage of the contract price regardless of costs" under the first prong of the third sentence of FAR 52.212-4(l) and "to allow preparatory costs…allowable in terminated non commercial contract[s] would be inconsistent with FAR 52.212-4(l)." (Gov't br. at 88)

As discussed above, SWR does not receive a percentage of the contract price for work performed because no work was performed here. SWR's only recovery of monies as fair compensation occurs under the second prong of the third sentence of FAR 52.212-4(l). Thus, the Army's premise – that SWR recovers a percentage of the 0013 Contract price regardless of its costs – simply is incorrect. More importantly, contrary to the Army's assertion, the second prong of the third sentence of the FAR contains no language that limits or restricts compensation when a contract has been terminated to payment for services rendered. As explained above, we decline to read such language into FAR 52.212-4(l) where it does not now exist. *Victory Constr.*, 510 F.2d at 1386.

The Army further asserts Mr. Swindall's travel charges "appear to be properly allocable to" the Bridge Contract because his credit card billing statement reflects that the charge for a month's rental of beachfront lodging was posted on 10 May 2006, the last day of the month's rental, after issuance of the stop work order (gov't br. at 89). It contends that the charges are not compensable under FAR 52.212-4(l) because they relate to SWR's preparation to compete for award of the Bridge Contract (*id.*).

The Bridge Contract solicitation, however, was not issued until 24 May 2006, well after the incurrence of these expenses. While one of the charges for one month's lodging was not posted to a credit card until the 30th and last day of the one month's rental, the obligation to pay the month's rental and other charges were all incurred before issuance of the stop work order on 26 April 2006. We conclude (based on documents from SWR's standard record keeping system) that, as a result of the 0013 Contract convenience termination, SWR has incurred unavoidable reasonable travel and subsistence charges of $3,123.69 in preparing to perform the 0013 Contract which it is entitled to recover here. *See* FAR 12.403(c), 49.201(a); *MIG Corp.*, 05-2 BCA ¶ 32,979 at 168,385.

We also conclude (based on documents from SWR's standard record keeping system) that, as a result of the convenience termination, SWR incurred unavoidable, reasonable charges for the wages of its project manager in preparing to perform the POV contract which it now is entitled to recover. *See* FAR 12.403(c), 49.201(a); *MIG Corp.*, 05-2 BCA ¶ 32,979 at 168,385. While SWR seeks $3,588.64 (app. br. at 27; app. reply br. at 26), the checks and pay stubs produced for Mr. King encompass two pay periods totaling 28 days. SWR, however, is only entitled to recover Mr. King's wages for 6 April (contract award) through 27 April 2006 (stop work order issuance) or a total of 21 days. We therefore reduce the sum set forth on checks and pay stubs ($3,572.48) by one quarter to reflect wages for only 21 days, granting SWR recovery of $2,679.36 for Mr. King's wages.

4. $6 Million Fabric Structure "Purchase"

SWR asserts in its briefs that it purchased from FES for $6 million the three new 1,000-foot-long Aztec tents and numerous "used" tents collected mostly by FES through its "sweat equity," i.e., willingness to disassemble and relocate fabric structures an owner no longer had any use for and did not desire to store, and that the purchase price for these structures included transportation to Hawaii and installation. According to SWR, upon award of the 0013 Contract, it accepted a 10 November 2005 offer from FES to sell these structures and perform related services for the sum of $6 million. SWR adds that, after the Army terminated the 0013 Contract for convenience, FES sold several of the fabric structures and "bought back" the remainder for $2 million, leaving SWR with an obligation to pay FES $2,867,500 for the fabric structures, which it seeks here. (App. br. at 18, 23, 44; app. reply br. at 14-15, 18-21, 26)

The Army asserts that SWR has not demonstrated using its bank statements, tax returns, general account ledger or any accounting records that it incurred a $6 million liability for purchase of fabric structures. It also asserts the actions of SWR and FES during 2006 did not reflect that SWR had "purchased" the fabric structures from FES but that FES was allowing SWR to use the tents pursuant to a lease of some form (such as rent with option to buy), citing FES charging SWR $30,000 a month rent for

46

use of the new Aztec tents on the Bridge Contract, SWR making $30,000 payments to FES in response to FES rental invoices, and FES taking all actions with respect to sale of several of the structures (e.g., negotiating their sale price and collecting their sale proceeds). The Army notes all of SWR's purported agreements with FES were said to be "oral," which it states "is fraught with the opportunity for fraud and collusion." The Army adds that, while SWR suggests it paid $6 million for fabric structures in an arms-length transaction, the appraisal SWR obtained for the fabric structures after contract termination indicated their fair market value was only $750,000. (Gov't br. at 75-77, 99, 108, 110; gov't resp. at 11, 14, 17)

It is well established that a contractor has the burden of proving the costs it incurred in performance of items of work that were terminated. *E.g.*, *Del. Tool & Die Works, Inc.*, ASBCA No. 14033, 71-1 BCA ¶ 8860 at 41,183, *aff'd on recon.*, 72-1 BCA ¶ 9206; *accord Lisbon Contractors*, 828 F.2d at 767; *Dehdari General Trading & Contracting EST*, ASBCA No. 53987, 03-1 BCA ¶ 32,249 at 159,450. SWR's commercial items contract contains a convenience termination clause, FAR 52.212-4(l), expressly specifying the "Contractor shall be paid...reasonable charges the Contractor **can demonstrate to the satisfaction of the Government using its standard record keeping system that have resulted** from the termination (emphasis added). Accordingly, to recover fabric structure cost here, SWR must at a minimum show "using its standard record keeping system" that it actually incurred such cost. We agree with the Army that SWR has not made that showing here.

While a commercial items contractor is not required to submit to an audit, FAR 12.403(d)(ii) and 52.212-4(l), a DCAA audit actually occurred of the standard records kept by SWR here. The audit report found:

> SWR's books and records do not reflect any accounting entry for the claimed $6,000,000 buildings expense. We obtained the contractor's financial statements for FY 2005 and FY 2006. We did not see the $6,000,000 building recorded as an asset, in accounts payable, or on its 2005 & 2006 tax returns. The contractor did not record the $6,000,000, either as a period expense during FY 2005 or FY 2006 or as a capital expense to be depreciated over the useful life of the asset(s)....

(R4, tab 99 at 6) While SWR's tax returns and other standard financial records reflected SWR's expenses for other items, such as vehicles, the DCAA auditor who reviewed the audit prior to its issuance testified at trial that SWR's standard records reflected "no asset entry, no note payable, no accounts payable, no anything" regarding its $6 million purported purchase of fabric structures from FES (tr. 3/132).

SWR acknowledges that it cannot point to any contemporaneous document which references the purported $6 million purchase, not even one email or letter (*see* app. br. 14-15; tr. 1/230, 237, 251). It maintains in its briefs that a "quote" dated 10 November 2005, about five months before contract award, and a claim filed with the bankruptcy court more than three years after the 0013 Contract was terminated, are sufficient documentation to establish existence of the fabric structure purchase (app. br. at 41-42; app. reply br. at 14-15). SWR, however, fails to recognize that the "quote" – which on its face is merely an "unexecuted," Word-software-generated document stating that the document constitutes a "quote" expiring in November of 2005, months before the 0013 Contract award – in no way shows or establishes that a $6 million purchase or contract was entered into months later (or for that matter at any time) by SWR and FES. Moreover, a claim submitted by an asserted creditor in a bankruptcy proceeding, such as the claim filed by FES in SWR's Chapter 11 action, is nothing more than what we call it – a "claim." An unsupported claim document that is submitted by a party seeking money is not proof of the claim that the party asserts. *Roberts Int'l Corp.*, ASBCA No. 15118, 71-1 BCA ¶ 8869; *accord Industrial Refrigeration Service Corp.*, VABCA No. 2532, 91-3 BCA ¶ 24,093 at 120,594 (mere allegations are insufficient to satisfy proof burden).[5]

While SWR appears to suggest we are free to accept the testimony of Mr. Swindall that a $6 million purchase of fabric structures occurred here between SWR and FES and simply make such a finding, SWR's suggestion contravenes the express language of the convenience termination clause of its contract. Under the clause, a contractor is entitled to payment of charges it can "demonstrate to the satisfaction of the Government using its standard record keeping system," not any charges asserted under oath by a company official. *See Industrial Refrigeration Service*, 91-3 BCA ¶ 24,093 at 120,594 (comprehensive documentation complying with cost principles will not be required, but contractor must meet burden of proving costs were incurred). We note that, while Mr. Swindall asserted under oath at trial that SWR purchased $6 million of fabric structures from FES, including the 1,000-foot-long Aztec tents used by it on the Bridge Contract, only six months earlier he asserted under oath in an affidavit filed with the Board that SWR leased the Aztec tents from FES and paid FES a monthly rental for the tents of $30,000. Mr. Swindall asserted at trial that his earlier statements under oath in the affidavit simply were a mistake, but SWR's record keeping system contains

---

[5] We note that the FES bankruptcy claim states it is corroborated by SWR's appeal here, which "references" FES's claim. SWR's appeal here is simply another "claim" (this time by SWR against the Army) and once again is not proof of existence of a $6 million contract between FES and SWR. We further note that the bankruptcy claim SWR relies on conflicts with its own assertions of an FES contract. The claim states that FES began performance of its claimed SWR contract by shipping fabric structure components from California to Hawaii in "March 2006," the month before award of the 0013 Contract.

invoices from FES seeking $30,000 a month during SWR's use of the Aztec tents on the Bridge Contract and $30,000 checks from SWR to FES in response to those invoices. These documents impeach Mr. Swindall's trial testimony. *Unified Eng'g*, 81-1 BCA ¶ 14,940 at 73,937 (the most dependable proof of payment of rent is cancelled checks). It is well established that "[e]xaggeration, inherent improbability, self-contradiction, omissions in a purportedly complete account, [and] imprecision and errors may all breed [the] disbelief and therefore the disregard of even uncontradicted nonopinion testimony." *Sternberger v. United States*, 401 F.2d 1012, 1016 (Ct. Cl. 1968). Thus, even if we were to ignore the termination clause language, we cannot accept the trial testimony regarding an SWR fabric structure purchase. *See Industrial Refrigeration Service*, 91-3 BCA ¶ 24,093 at 120,595 (credible evidence must be presented to establish the validity of claimed costs). While SWR attempts to buttress the trial testimony of Mr. Swindall by citing isolated sentences from the deposition of the FES official who dealt with SWR, after reviewing the entire deposition, we concur with the witness that he appears to be experiencing health problems affecting his memory.[6] We have thoroughly reviewed all testimony and documentation in this appeal, and cannot state with any certainty the nature of the relationship between SWR and FES. The evidence here does not disclose whether FES was acting principally as a lessor, partner, party to a joint venture, agent, subcontractor, or in some other role. To find that FES possessed a $6 million contract with SWR and solely was a subcontractor selling goods, as the dissent would have us do, would be to base a finding on surmise.

In sum, it is SWR's burden to show charges it incurred in performance of items of work that were terminated. SWR has not demonstrated that it incurred $6 million in charges for purchase of fabric structures from FES and therefore cannot show it should be paid any part of the alleged purchase charges pursuant to the convenience termination clause set forth in its commercial items contract.[7] FAR 52.212-4(l).

---

[6] None of the judges on this panel had an opportunity to observe Mr. McGarry of FES. The only FES testimony here is the "transcript of a deposition" where the Army clearly was surprised to learn from the witnesses' own testimony that the witness suffers from health problems affecting his memory.

[7] The dissent "finds" that SWR had an "oral understanding" that it "purchased" the three new 1,000-foot tents, plus numerous used tents owned by FES, for $6 million in "April 2006" based on trial testimony by Mr. Swindall (¶ 8), but Mr. Swindall also testified under penalty of perjury that SWR paid "rent" for the three new 1,000-foot tents from June 2006 through February 2007 and the latter testimony is supported by SWR's business records. We are *not* familiar with *any* business practice to pay "rent" to use tents or other items that a company previously has "purchased" and, therefore, cannot accept the dissent's "finding" that the new 1,000-foot tents were "purchased" by SWR in April 2006 (¶¶ 7, 8). *See, e.g., United States v. Winstar Corp.*, 518 U.S. 839, 862-63 (1996) (a tribunal should not interpret a record in a manner favoring irrational business conduct).

## 5. Settlement Charges

In its briefs, SWR seeks $11,591.41 in attorney fees that it was charged by two law firms for legal work with respect to preparation of its convenience termination settlement proposal and subsequent discussions/negotiations occurring with the Army concerning that proposal (app. br. at 28; app. reply br. at 25). The Army acknowledges that attorney fees comprising settlement expenses are compensable under the second prong of the third sentence of FAR 52.212-4(l), but asserts in its post-trial brief that SWR's claim of attorney fees charges includes $4,265 of unsubstantiated, unrelated charges and therefore should be reduced to $7,326.41 (gov't br. at 90). In its post-trial reply brief, the Army states SWR is "probably entitled to recover $8,778 in settlement expenses" but offers no explanation for the more than $1,300 difference in attorney fee charges it previously acknowledged as recoverable (gov't resp. at 19).

Allowance of reasonable attorney fees for services rendered in preparation of a termination settlement proposal and in attempting to negotiate an amicable resolution of the charges presented in the proposal is well settled. *E.g., Dairy Sales Corp.*, 593 F.2d at 1005 (attorney fees are compensable costs if incurred for the preparation of termination settlement claims); *H&J Construction Co.*, ASBCA No. 18521, 76-1 BCA ¶ 11,903 at 57,085. We have reviewed the attorney billing records admitted into evidence at trial, found the charges arise from the preparation and negotiation of SWR's convenience termination settlement proposal, and the total of such charges is not less than the sum sought by SWR here. The attorney fee costs are reasonable (both in terms of rates and number of hours) and comprise unavoidable charges resulting from the Army's termination of the 0013 Contract recoverable under the second prong of the third sentence of FAR 52.212-4(l). SWR therefore is also entitled to recover $11,591.41.

## 6. General and Administrative (G&A) Expenses as a Burden

SWR seeks to recover charges for home office overhead with respect to sums it recovers here under the convenience termination clause. SWR asserts that: its "home-office [overhead] costs are identified, collected, and entered in QuickBooks [software-generated records] by SWR employees"; its profit and loss statements are generated internally by its employees; its total allowable G&A expenses for FY 2006 were $1,217,155.36; its total direct costs for FY 2006 were $10,174,586.17; and its G&A or home office overhead rate for FY 2006 therefore "was approximately 11.9%." (App. br. at 29-30, 32-33; app. reply br. at 22-23, 26)

The Army asserts that, as a matter of law, G&A is not an allowable charge under a FAR Part 12 commercial items termination. Citing the Board's *Red River* decision which was reversed, the Army states overhead is not compensable "in a

50

commercial items context" as it "would be in a FAR Part 49 scenario" because a contractor under FAR Part 12 is not required to "adhere to contract cost principles" and be audited, precluding the government from verifying "the validity of any costs not directly related to contract performance." The Army additionally asserts recovery is inappropriate because SWR "is seeking direct costs associated with the terminated contract 0013, but is also seeking payment for those costs indirectly as they were included in the G&A [base] amount" used to calculate its G&A rate, thereby seeking payment from the Army "twice for the same expense." It cites inclusion by SWR of over $3 million of termination costs claimed here in its G&A base used to calculate a 2006 overhead rate. (Gov't br. at 91-93)

As discussed at length above, FAR 52.212-4(l) contains no language in the second prong of its third sentence limiting or restricting fair compensation when a commercial items contract has been terminated to payment for services rendered, as the Army contends. The second prong, when read in conjunction with the first prong of the third sentence relating to recovery for work completed, refers to the recovery of those charges incurred that "do not relate to work completed" but to work terminated and not performed that should be reimbursed to fairly compensate the commercial items contractor whose contract has been terminated. Indirect costs of G&A or home office overhead can be such a charge. *See, e.g.*, *Nicon*, 331 F.3d at 878; *Kasler Elec.*, 84-2 BCA ¶ 17,374 at 86,571.

In performing a contract, a contractor incurs both "direct" and "indirect costs." Direct costs are those directly attributable to the performance of a specific contract and can be traced specifically to that contract. *Charles G. Williams Constr., Inc. v. White*, 271 F.3d 1055, 1057-58 (Fed. Cir. 2001). "Indirect costs include such things as home office overhead, [and are] defined as costs 'that are expended for the benefit of the whole business [and] by their nature cannot be attributed or charged to any particular contract.'" *Nicon*, 331 F.3d at 882, (quoting *Altmayer v. Johnson*, 79 F.3d 1129, 1132 (Fed. Cir. 1996)). A contractor generally recovers "indirect costs" by allocating a proportionate share to each of its contracts. *Nicon*, 331 F.3d at 882; *Charles G. Williams*, 271 F.3d at 1058.

As the Army observes, in calculating a G&A rate for application to sums SWR recovers under the convenience termination clause, SWR added over $3 million of termination costs it claims in this appeal as "direct costs" to its direct expense base totaling $7,273,783 (consisting of its total expenses for 2006 less indirect home office expenses and unallowable costs) to calculate the 2006 G&A rate. The net effect of adding the costs sought here to the total direct expense base by which indirect home office overhead costs were divided to obtain a percentage rate was to "reduce" SWR's resulting overhead percentage rate. While the Army suggests inclusion of the costs in the base was an effort to recover those costs twice, it was nothing more than an effort to arrive at a proper rate by taking total indirect costs for 2006 ($1,217,155) and dividing those costs by an allocation measure, which in this case was total direct costs

51

for 2006. The Army's contention that SWR should recover "no" overhead charges because it added costs sought in this appeal (which were generally not reflected in SWR's QuickBooks records) to the rate calculation's direct expense base resulting in SWR having an overhead rate of 11.8%, rather than excluding its costs sought here, which would have resulted in SWR having an overhead rate of over 17%, makes no sense and reflects a misunderstanding of the calculation and DCAA audit report.

As expressly contemplated by FAR 52.212-4(l), using its standard record keeping system, SWR demonstrated that based on its QuickBooks records its 2006 G&A rate could be calculated at 11.8%. SWR's G&A calculation (and resulting G&A) rate charge are reasonable for a business of SWR's size and resulted from the termination. Accordingly, pursuant to FAR 52.212-4(l), SWR is additionally entitled to recover G&A burden charges (calculated as a percentage of the sums it recovers) except with respect to settlement charges and profit. *See Alfair Dev. Co.*, ASBCA Nos. 53119, 53120, 05-2 BCA ¶ 32,990 at 163,506, 163,516, *aff'd per curiam, Alfair Dev. Co. v. Harvey*, 208 F. App'x 840 (Fed. Cir. 2006); *Safeco Ins. Co. of Am.*, ASBCA No. 52107, 03-2 BCA ¶ 32,341 at 160,024; *Technical & Mgmt. Servs. Corp.*, ASBCA No. 39999, 93-2 BCA ¶ 25,681, *aff'd per curiam, Technical & Mgmt. Servs. Corp. v. Kelso*, 1993 U.S. App. LEXIS 33425 (Fed. Cir. Dec. 13, 1993).

### 7. Profit

SWR also seeks profit with respect to the sums it recovers pursuant to the convenience termination clause. SWR asserts it typically earns eight to 10 percent profit on government contracts and seeks eight percent profit here. (App. br. at 30, 33; app. reply br. at 26)

The Army asserts that profit is only compensable under the "percentage of the work performed" prong of the third sentence of FAR 52.212-4(l) and SWR cannot receive monies under that first prong because SWR "performed no commercial vehicle storage services under the contract." According to the Army, FAR 52.212-4(l) "does not contemplate profit apart from whatever profit is included in the contract pricing terms." (Gov't br. at 93)

The Army further asserts that, while DCAA did not evaluate profit, it found based upon SWR's 2006 financial statements that SWR's FY 2006 profit rate was actually three percent, not eight. The Army explains DCAA used SWR's net income of $289,903 and divided it by total income of $8,866,428 to arrive at its rate. (Gov't br. at 93-94; R4, tab 99 at 14-15)

The Army's interpretation of FAR 52.212-4(l) – as providing only for receipt of profit under the third sentence's first prong percentage calculation for recovery with respect to work performed – appears in accord with the district court's interpretation in *Red River*, 802 F. Supp. 2d at 662 n.18. With respect to the profit claim, the Army

52

correctly notes there can be no recovery under the first prong because the contract was terminated before the performance of contract work. SWR therefore recovers nothing under the first prong and is limited by the plain language of FAR 52.212-4(l) to recovery under the second prong, which can be the only basis for the just or fair compensation it is to receive.

Throughout the very lengthy history of termination for convenience clauses contractors have been allowed to recover profit as part of the fair compensation they receive in their contract termination settlements, except monies the contract "would have produced by way of profit if it had been fully performed." *E.g., Russell Motor Car*, 261 U.S. at 523-24; Urgent Deficiency Appropriation Act, 40 Stat. 183; Dent Act, 40 Stat. 1272-73 (reasonable remuneration for expenditures and obligations or liabilities necessarily incurred in performing or preparing to perform the contract allowable; anticipated profits not allowable); Contract Settlement Act of 1944, 58 Stat. 652 (allowance for profit on both the preparations made and work done); ASPR 407.401, 17 Fed. Reg. 1795 (1952) (settlement should compensate contractor fairly for work done and preparations made for terminated portions of contract, and include an allowance for profit thereon). The Court of Claims has stated that the only substantial difference between sums recoverable by a contractor under a convenience termination clause and the sums recoverable in a common-law action for contract breach, which include profit, "is the non-inclusion in the former of anticipated but unearned profits." *William Green Constr.*, 477 F.2d at 936.

Both Congress and the regulators drafting FAR 52.212-4(l) were aware of this history based on the role convenience terminations play in government procurement, but set forth no express language in FASA or FAR 52.212-4(l) barring recovery of profit under the second prong with respect to expenditures a contractor incurred in preparing to perform terminated, unperformed contract work. We conclude to impose such a bar would be to read into the FAR an unarticulated procurement policy contrary to the overall purpose of a termination for convenience settlement, which is to fairly compensate a contractor and make a contractor whole for costs incurred in connection with the terminated work. A contractor should not suffer as a result of a convenience termination and should receive as part of its settlement a reasonable allowance for profit. *See Nicon*, 331 F.3d at 885; *Jacobs Eng'g*, 434 F.3d at 1381; *General Dynamics Land Sys.*, 02-1 BCA ¶ 31,659 at 156,411.[8]

---

[8] The dissent would deny award of profit under the second prong of the third sentence of FAR 52.212-4(l) because FAR 12.403(a) ("*General*") states that the commercial item convenience termination clause paragraphs "contain concepts which differ from those contained in the...clauses prescribed in Part 49." The dissent, however, fails to recognize that, as discussed above, this statement in FAR 12.403(a) references the substitution of an approach different than the (1) cost reimbursement approach used generally in Part 49 and (2) application of cost accounting standards, cost principles, and audits necessary for the use of

We conclude that, based on the circumstances of this case, SWR should recover profit at the rate of five percent on charges it recovers as part of its fair compensation, except for settlement expense and G&A indirect cost, which do not represent costs of preparations made for the terminated work. *See G.E. Boggs & Assocs., Inc.*, ASBCA No. 34841 *et al.*, 91-1 BCA ¶ 23,515 at 117,909; *Techno Eng'g & Constr., Ltd.*, ASBCA No. 36869, 90-1 BCA ¶ 22,566 at 113,250. We have not found that SWR invested significant capital to perform the 0013 Contract, but recognize that it developed a creative approach to performance with used fabric structures that may have saved the Army money had the contract been performed and that it procured a reasonable settlement of the Pineridge Farms lease. We also recognize that, due to the suspension of work and termination of the 0013 Contract, SWR received a sole-source Bridge Contract that allowed it to earn profit from the Army's POV requirements for 9 of the 12 months of the 0013 Contract base period, but apparently not sufficient profit to avoid a Chapter 11 bankruptcy filing about two years after its completion of the Bridge Contract.

## SUMMARY

We reaffirm the well-established principle that, when the government elects to terminate for its convenience one of its contracts subject to a convenience termination clause, the contractor whose contract has been terminated is entitled to receive fair and just compensation from the government in the form of a termination settlement, which does not include anticipated but unearned profits. Commercial item statutes and their implementing FAR provisions contain no language indicating that their drafters had any intent to alter this principle, which has existed for approximately a century.[9]

---

the cost reimbursement approach, all differences specifically set forth in FAR 12.403(d), not the denial of profit in a convenience termination settlement, which would be a deviation from a century of prior practice and which clearly FAR drafters would reference specifically somewhere in FAR 12.403 if such a deviation had been intended.

[9] The dissent suggests that we limit the record in a termination for convenience appeal to the record made before the CO. We do no such thing here. For example, we review and discuss the DCAA audit report and other evidence presented at trial. The dissent also suggests that we defer to the judgment of the CO and do not conduct a *de novo* review. Again, we do no such thing here. The Army CO did not issue any final decision upon the convenience termination claim and did not grant SWR any sum of money. We award SWR over $100,000 based upon our review of the evidence in this appeal. Finally, the dissent suggests we impose a "special evidentiary burden" on commercial item contractors barring them "as a matter of law" from demonstrating their convenience termination claims with any evidence other than a "contractor record." Once again, we do no such thing here. In resolving this appeal, we examine and rely on, among other things,

CONCLUSION

The appeal is sustained in part. As set forth above, SWR is entitled to recover the sum of $123,489.37 plus CDA interest from 13 November 2008 until payment.

Dated: 4 December 2014

TERRENCE S. HARTMAN
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

(Signatures continued)

---

emails sent by the government, invoices generated by lessors, and bills of lading obtained by FES, none of which constitutes a "contractor record." As best we can ascertain, the dissent's true disagreement with our decision is that we abide by well-established legal precedent requiring a contractor to prove costs it incurred (*Lisbon Contractors*, 828 F.2d at 767; *Dehdari Gen. Trading*, 03-1 BCA ¶ 32,249 at 159,450.

We note that, while the dissent appears to assert it would deny SWR recovery of its tent purchase costs because SWR failed to mitigate damages by reselling purportedly purchased tents on eBay and upon the mainland, the record here contains little evidence regarding the market for reselling fabric structures, other than an affidavit from an official of Aztec indicating the tents were valued less than the sum allegedly credited by FES and the deposition testimony of the FES official indicating there is not much of a re-sale market and such structures frequently are abandoned by their owners or donated to charity. Consequently, we would be unable to conclude based on the record that there was a failure to mitigate.

55

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

ELIZABETH A. TUNKS
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

REBA PAGE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur in part and dissent in part (see separate opinion)

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

56

## OPINION BY ADMINISTRATIVE JUDGE MELNICK
## CONCURRING IN PART AND DISSENTING IN PART

SWR has claimed a number of categories of costs it says are owed under the commercial items termination for convenience scheme applicable to this contract. I concur in result with the majority respecting SWR's work performed claim, travel claim, manager salary claim, settlement charge claim, and General and Administrative Expense claim. I also concur with the majority's denial of SWR's claim for storage structure costs, but write separately to explain my disagreement with the majority's reasoning. I respectfully dissent from the majority's award of SWR's $75,000 deposit, the $15,000 Pineridge Farm bill, and profit.

The following are the facts as I would find them.

1. On 25 October 2005, the United States Army's Regional Contracting Office, Fort Shafter, Hawaii, issued Solicitation No. W912CN-06-R-0004 (R4, tab 1). It sought proposals to enter a requirements contract to provide storage services on Oahu for the privately-owned vehicles of deployed service members. The contractor was to provide "an enclosed storage facility with four walls, concrete, asphalt, or hard packed gravel ground, roof, and fire protection/alarm system." (*Id.* at 3) The storage facility was to have 24-hour uniformed security personnel, be enclosed by fencing, have access to electricity, and be permitted by local authorities for the specified use (*id.*). In summary, the contractor was to receive and process vehicles, store them, maintain them, release them, provide reports to the government, resolve business problems and claims, and distribute customer service comment cards (*id.* at 6).

2. The solicitation contained contract line item numbers (CLINs) for a single base year of performance with four option years. There were six CLINs for each year's services. (R4, tab 1 at 13-28) Among them was CLIN 0001AA, which itemized the monthly "[c]ost of rental/lease of property to store estimated 2000 - 2500 vehicles, [c]ontractor to invoice monthly the cost of property lease/rent " (*id.* at 14). Another was CLIN 0001AB, which, after Modification No. P0001 was issued on 25 January 2006, provided that the contractor:

> Furnish warehouse space to store Privately Owned
> Vehicles (POVs) in accordance with the statement of work,
> (storage units to accommodate minimum of 100 vehicles
> per storage unit)[.] Delivery orders for storage units will
> be issued as required. Contractor will receive 30 day
> notice of various deliveries of vehicles, vehicles are
> required to be under cover...within 30 days of receipt of
> delivery order. (To be billed monthly for total number of
> storage units utilized).

(R4, tab 2 at 2) The CLIN contemplated a maximum of 360 storage units.[10] Thus, under this CLIN, the contractor was to itemize the monthly cost of storage units capable of accommodating a minimum of 100 vehicles each. Delivery orders would be issued for individual storage units and billings would be on a monthly basis for each unit used. Thirty days notice would be given for the delivery of vehicles, and vehicles would be required to be under cover "within 30 days of receipt of delivery order." Among the factors the solicitation stated would be considered for award was a mobilization plan that explained how the contractor planned to be fully operational "within 30 days after the contract award" (R4, tab 1 at 36).

3. Previously, SWR had performed a contract for services similar to those in the solicitation (R4, tab 3 at 9). In preparing to submit an offer, SWR concluded that structures manufactured by Sprung Instant Structures, Inc. (Sprung) would be acceptable storage units for the vehicles (tr. 1/93-95). Accordingly, it contacted Mr. Jim McGarry, founder of Florida Exposition Service, Inc. (FES). FES was a Sprung installation contractor that had acquired a number of Sprung structures of its own over the years. (R4, tab 3 at 9; dep. of Jim McGarry (dep.) at 14-18, 25, 35, 42-44, 52, 190) FES chose to supply structures to SWR for the contract after confirming that Sprung had no interest in doing so itself (dep. at 66-69). In a letter dated 10 November 2005, FES informed SWR that it would sell SWR up to 400,000 square feet of Clear Span Membrane Structures for $6 million (R4, tab 45; dep. at 42, 70). The sale would include a variety of Sprung structures in FES' possession, plus three 40 x 1000 foot structures FES would purchase from a company named Classic Tents (dep. at 28-29, 74, 253-54, dep. ex. 13 at 2).

4. On 21 February 2006, SWR submitted a revised proposal to the government in response to the solicitation (R4, tab 3; app. ex. 2, tab 14). SWR identified property it would lease for a minimum of five years (R4, tab 3 at 4). It also stated that vehicles would be housed in Sprung structures that it would purchase from FES and install on the property (id. at 9). It indicated that each structure would store at least 100 vehicles and that a total of 360,000 to 400,000 square feet of space had been "programmed." SWR explained that purchasing the structures from FES created a "tremendous savings" that it would "pass on to the Government as reflected in our bid price." (Id.) Though it did not state how much it was paying for the structures, or describe any other terms of its transaction for them, SWR represented that its relationship with FES provided an "unusual opportunity of procuring these structures at below normal market value" (id.). SWR also provided a schedule of tasks that it would perform to have all of the facilities, equipment, and personnel in place to commence operations 30 days after award (id. at 82-84).

---

[10] I interpret the requirement to be for a maximum of 30 units per month, times 12 months, for a total of 360 units.

58

5. SWR offered to provide the leased property required by CLIN 0001AA for $215,314.63 per month during the base year, for a total of $2,583,775.56. SWR's total offer for CLIN 0001AA for both the base and option years was $8,392,209.72. SWR offered to furnish up to 360 units of warehouse space under CLIN 0001AB for the base year for $950.83 per unit, for a total of $342,298.80. SWR's total offer for CLIN 0001AB for both the base and option years was $1,711,494. (App. ex. 2, tab 14 at 834-49)

6. On 6 April 2006, the government awarded Contract No. W912CN-06-D-0013 to SWR and authorized it to begin performance (R4, tab 4). The contract contained the solicitation's schedules and the prices proposed by SWR (*id.* at 15-30). It contained the Federal Acquisition Regulation (FAR) 52.212-4, CONTRACT TERMS AND CONDITIONS— COMMERCIAL ITEMS (OCT 2003) clause; the FAR 52.216-21, REQUIREMENTS (OCT 1995) clause; and the FAR 52.242-15, STOP-WORK ORDER (AUG 1989) clause (*id.* at 34, 42, 46). Pursuant to the FAR 52.216-18, ORDERING (OCT 1995) clause, "services [were] to be…ordered by issuance of delivery orders or task orders" beginning on 1 April 2006 (*id.* at 41). The contract specified the initial delivery dates for all of the base year CLINs to be 1 June 2006 (*id.* at 31). The parties held a post-award conference on 17 April 2006, which was attended by SWR's Vice President, Mr. Timothy Swindall, and the contracting officer (CO). The conference agenda stated that the contract's base period was to begin on 8 May. (R4, tab 52 at 6)

7. Upon receiving the award, Mr. Swindall telephoned Mr. McGarry of FES and informed him of it. Mr. Swindall instructed Mr. McGarry "to get busy…to get structures over there and installed." (Tr. 1/142) FES inquired into transportation costs and commenced efforts to transport structures and equipment in its possession on the mainland to port in Los Angeles, California, for shipment to Hawaii (dep. at 86-94). On 13 April 2006, SWR sent FES a check for $75,000 (R4, tab 50; dep. at 75-76). On 20 April, FES had a $75,000 Cashier's Check issued to Classic Tents for the three additional 40 x 1000 foot structures, which it purchased for $474,000 (R4, tab 51; dep. at 171, dep. ex. 13 at 26).

8. SWR and FES did not execute a written contract for the sale of the structures by FES to SWR. Nor did SWR record any such agreement in its accounting records (tr. 2/80-81). However, in April 2006, Mr. McGarry and Mr. Swindall established an oral understanding between them that FES would transfer the structures to Hawaii, install them, and that SWR had three years to pay FES $6 million for them, after which SWR would own them "free and clear" (dep. at 70-76, 252, 258; tr. 1/120-21, 2/68).[11]

---

[11] The majority dismisses this understanding at least partially because Mr. McGarry admitted that he has experienced memory problems. Mr. McGarry's testimony about his arrangement with SWR was clear and unequivocal, without leading or prompting by counsel (dep. at 70-76). Moreover, it is implausible that Mr. McGarry incurred the cost of shipping structures to Hawaii for SWR

59

SWR would need to perform for three years to receive sufficient revenues to pay for the structures (tr. 2/27-28). At the time they developed their understanding, Mr. McGarry and Mr. Swindall did not consider or address what would happen if the government terminated SWR's contract for convenience prior to SWR paying for the structures (dep. at 78-79, 225-26).

9. Upon receipt of the award, SWR also contacted its on-site project manager and instructed him to begin interviews and commence acquiring necessary equipment (tr. 1/142-43). During April 2006, the project manager worked full time to recruit employees, help with site preparation, and develop agreements for support services on site (tr. 1/195). He was paid $3,572.48 in salary (app. ex. 1, tab 4 (tab 6 at 1214-15)). Additionally, Mr. Swindall travelled to Hawaii between 6 April and 20 April to deal with the commencement of the contract. He incurred $3,123.69 in costs for transportation, food, and lodging. (R4, tab 9 at 60, tab 11 at 10; tr. 1/201-02) SWR also contacted the owner of the land it intended to use for the contract, instructing it to begin site preparation (tr. 1/146-47). Rock was crushed and spread on the site (R4, tab 31).

10. The government never issued any delivery orders under the contract (tr. 1/247, 2/137). In late April 2006, another offeror protested the award to SWR, prompting the government to issue Modification No. P00001 on 28 April 2006, ordering SWR to stop work under the contract (R4, tab 5; tr. 1/159).

11. There is no evidence that, at the time SWR received the government's stop-work order, FES had placed any structures or equipment on ships to Hawaii (R4, tab 9 at 32-50). Nevertheless, SWR did not instruct FES to suspend its shipments. Instead, after orally informing FES about the stop-work order, SWR consented to the continuation of shipments, advising FES that it believed the order would be lifted. (Dep. at 96-102) FES shipped the structures on freighters from Los Angeles to Hawaii between early May and early August of 2006 (R4, tab 9 at 32-50; dep. at 91). FES paid approximately $109,000 to ship the structures from its facilities on the mainland to an SWR site in Hawaii (R4, tab 9). Return charges would have been similar (dep. at 126).

12. On 24 May 2006, the government issued a solicitation for a bridge contract to store an estimated 800 vehicles while the primary contract was being protested. SWR was awarded the bridge contract on 30 May and SWR performed it from June of 2006 through February of 2007. (R4, tabs 56, 58; tr. 2/62-63) SWR used the three 40 x 1000 foot structures to perform the bridge contract, and made payments to FES from the contract's proceeds. At different times it has referred to those payments as

without any understanding between the parties as to payment terms. *See United States v. Winstar Corp.*, 518 U.S. 839, 863-64 (1996) (disfavoring an interpretation of the record based upon irrational business conduct by a party). The preponderance of the evidence favors an agreement.

rent or payments toward their purchase. (R4, tabs 68, 76, 101 at 5; tr. 1/171-73, 180, 242, 267-69)

13. The government eventually took corrective action in response to the protest of the primary contract (R4, tab 29 at 4). On 3 July 2006, the government issued Modification No. P00002, terminating the primary contract for its convenience (R4, tab 6). Upon receiving notification of the termination, SWR orally notified FES (tr. 1/169; dep. at 135). Intending to use the delivered structures, SWR submitted proposals for additional bridge contracts, and a follow-on contract, but was not awarded any of them (R4, tabs 66-67; tr. 1/261-63, 269-70).

14. On 30 April 2006, SWR submitted an invoice to the government under CLIN 0001AA of the contract for $215,314.63 (R4, tab 9 at 70). On 14 August 2006, it revised that invoice, seeking a prorated amount under the CLIN applicable to the period from 6 until 27 April 2006, totaling $157,897.30 (R4, tab 8 at 2; tr. 1/160-62). The CO responded that the invoice would be handled under the termination for convenience settlement process (R4, tab 8 at 1).

15. With the termination of the primary contract, SWR and FES had excess structures on-hand in Hawaii. SWR relied upon Mr. McGarry of FES to dispose of them (tr. 1/261). Mr. McGarry initially chose not to return them to the mainland, but to just "start getting rid of the inventory" in Hawaii by taking whatever price it could get there (dep. at 126, 130, 158-279). However, because FES was a Sprung installation contractor, Mr. McGarry declined to compete with Sprung's own structure marketing efforts in Hawaii. This restriction limited the list of potential customers to whom SWR and FES marketed the structures in Hawaii to Sprung, Classic Tents, and the government. (*Id.* at 143-45, 160-61, 190-96, 278-80; tr. 2/47-50) Neither FES nor SWR advertised the structures on any internet sales sites (dep. at 145, 192; tr. 1/260-61).

16. In September of 2006, FES sold some of the excess structures to Sprung for $5 per square foot, for a total of $345,000 (dep. at 148-54, dep. ex. 10 at 1-2). Mr. McGarry believed that, as a manufacturer, Sprung would not pay more for the structures than what it would cost to manufacture them. Nevertheless, Mr. McGarry was looking for a ready buyer "to get rid of them" (dep. at 158-59). In April 2007, after SWR's bridge contract had expired, FES sold the three 40 x 1000 foot structures it had purchased from Classic Tents back to that company for $165,000 (*id.* at 166-71, dep. ex. 10 at 3). Like Sprung, Mr. McGarry believed Classic would only pay its manufacturing cost (dep. at 169). Mr. McGarry considered Sprung and Classic to have "lowballed" FES because they had it "over a barrel" (*id.* at 122). He recognized that FES could have received a better price marketing the structures on the mainland, and that FES' relationship with Sprung limited the market available for reselling the structures (*id.* at 279).

17. On 2 November 2006, Pineridge Farms, Inc., the owner of the land upon which SWR had planned to locate the structures for contract performance, billed SWR $15,000, seeking "[r]eimbursement for services" itemized as engineer fees and equipment and labor charges (R4, tab 80).

18. On 12 December 2006, Mr. Swindall of SWR sent an email to Mr. McGarry of FES requesting certain documents "to move forward with...settlement." Among what he sought were two different "invoice proposals; 1 for full amount with me keeping structures, and 1 with a credit for you keeping the structures." (Dep. ex. 13 at 98) FES responded on 21 December with two invoices. One was a bill for $6 million for the purchase of 379,000 square feet of clear span membrane structure. The other contained the same charge, but added an option in which FES would credit back to SWR $2 million to buy back the structures. There is no evidence that SWR executed the option. (Dep. ex. 9)

19. SWR submitted a termination for convenience settlement proposal to the CO on 29 June 2007. The proposal sought $6,703,740.78. (R4, tab 9) The parties corresponded about the proposal, but failed to reach agreement (R4, tabs 10-11). SWR incurred $11,591.41 in attorney fees to support its preparation of the proposal and subsequent correspondence with the government about it (app. ex. 2, tab 10; app. br. at 28).

20. On 11 November 2008, FES proposed to take back possession of the remaining structures from SWR and to issue a credit to SWR in the amount of $2,792,500 against an outstanding debt to FES of $5,585,000 (R4, tab 17 at 9). Under FES' calculation, SWR's remaining debt to it would be $2,792,500. FES eventually shipped the remaining inventory back to California (dep. at 213). It donated a portion of the inventory and sold the remaining materials to a church (id. at 183-85).

21. On 13 November 2008, Mr. Swindall of SWR sent correspondence to the CO declaring an impasse respecting SWR's termination settlement proposal, converting SWR's proposal into a certified claim and seeking a CO's final decision. The letter stated that SWR had sold some of the structures for $415,000, and described FES' 11 November offer. Accordingly, SWR reduced its claim by $3,207,500.04. (R4, tab 17 at 8)

22. On 14 January 2009, SWR filed this appeal on a deemed denial basis, seeking termination for convenience costs that it quantified in a 27 April 2009 complaint in the amount of $3,905,742.12.

23. On 1 July 2009, SWR filed a voluntary petition in the United States Bankruptcy Court for the Middle District of Alabama under Chapter 11 of the bankruptcy code (app. supp. R4, tab 32). The petition listed FES as an unsecured creditor with a claim for $2,792,500, and SWR repeated that disclosure in a

subsequently filed schedule of unsecured creditor claims (app. supp. R4, tab 32 at 6, tab 34 at 26). It did not list Pineridge Farms as a creditor. FES filed a Proof of Claim in the bankruptcy proceedings for $2,792,500, describing an oral contract between itself and SWR for the sale of the structures (app. supp. R4, tab 35). There is no record of a proof of claim from Pineridge Farms. SWR's Plan of Reorganization recognized the unsecured creditor claims SWR had listed, including FES' claim (app. supp. R4, tab 37 at 18 of 39, tab 41 at 18 of 37). On 20 July 2010, the bankruptcy court entered a final order confirming SWR's plan (app. supp. R4, tab 43). The court issued a final decree closing the case on 15 March 2011 (app. supp. R4, tab 44).

DISCUSSION

I.     Storage Structures

The largest of the categories for which SWR demands payment is its structure costs. SWR contends that it entered into a contract with FES to purchase structures for $6 million to use for vehicle storage on its contract with the government. SWR maintains that, upon the government's termination of its contract, SWR continues to owe FES that purchase price. It says that, along with FES, it made reasonable efforts to mitigate its costs by selling off some structures and agreeing to sell the remainder back to FES for $2,792,500, leaving an outstanding debt to FES of $2,792,500 under the original purchase. SWR argues that it proved its debt to FES in its own bankruptcy, where SWR conceded the debt and the bankruptcy court allowed it. SWR therefore claims it is entitled to recover the $2,792,500 from the government as a reasonable charge resulting from the termination, plus the original $75,000 deposit SWR paid FES in April 2006, for a total of $2,867,500 in structure costs.

The Board has received a variety of both oral and documentary evidence relating to this part of SWR's claim. However, with the agreement of the majority, the government contends that most of that evidence is legally irrelevant. It relies on FAR 52.212-4(l), the Termination for Convenience clause for commercial items contracts, to conclude that a contractor may only recover those charges that it demonstrates to the satisfaction of the government using its "standard record keeping system." Any evidence other than what came from the contractor's records, such as the sworn testimony SWR proffered of its transaction with FES, fails to prove its claim as a matter of law.[12]

_____

[12]  Section III.B.4 of the majority's opinion imposes this standard record keeping system requirement upon SWR's structure claim, holding that "SWR must at a minimum show 'using its standard record keeping system' that it actually incurred such costs" and "[u]nder the clause, a contractor is entitled to payment of charges it can 'demonstrate to the satisfaction of the Government using its standard record keeping system,' not any charges asserted under oath by a

63

The majority's interpretation of FAR 52.212-4(l) precludes commercial items contractors from demonstrating their charges with proof other than their own records, such as evidence from their vendors or the government. This is a substantial limitation upon the pursuit of commercial items termination for convenience claims that is not imposed upon other contractors. And it is an unusual inquiry required of the Board, which will have to carefully scrutinize from where evidence originated. Now, evidence that is relevant to a contractor's costs will categorically fail, regardless of how compelling it may be to the trier of fact, if it did not happen to originate from the contractor's records. I do not believe the FAR requires this result.

Quite simply, FAR 52.212-4(l) imposes a two-prong requirement when the government terminates a commercial items contract for convenience. It must pay "a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination." The clause also relieves the contractor from complying with the cost accounting standards or contract cost principles, and denies the government a right to audit the contractor's records. The clause stresses that "[t]he Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided."

The FAR's rules governing the government's right to terminate a commercial items contract for convenience, and its corresponding payment obligations, are distinct from the elaborate regulations applicable to the government's terminations of non-commercial items contracts. Accordingly, FAR 12.403(a) stresses that FAR 52.212-4(l)'s termination clause "contain[s] concepts which differs from those contained in the termination clauses prescribed in Part 49. Consequently, the requirements of Part 49 do not apply when terminating contracts for commercial items and contracting officers shall follow the procedures in this section."

When a regulation has been incorporated into a contract it is still interpreted as a regulation and given the meaning intended by the promulgators. *Honeywell Inc. v. United States*, 661 F.2d 182, 186 (Ct. Cl. 1981). "We construe a regulation in the same manner that we construe a statute. We look at the regulation's plain language and consider the terms in accord with their common meaning." *Space Gateway Support, LLC*, ASBCA Nos. 55608, 55658, 13 BCA ¶ 35,232 at 172,978 (citations omitted). Considered in a vacuum, in addition to the percentage of the contract price, FAR 52.212-4(l) only allows those reasonable charges contractors can demonstrate to the satisfaction of the government using their standard record keeping systems. If we literally applied this language here on appeal, our only task would be to decide

---

company official." It rules that SWR's records fail to satisfy that test. The majority does not appear to follow this holding elsewhere in its opinion.

whether contractors satisfied the government as to their charges. We would do nothing more than review the record made before contracting officers and defer to their judgment. But the contracting officer's findings are not binding in an appeal here under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109. Our determinations are *de novo*. *See Wilner v. United States*, 24 F.3d 1397 (Fed. Cir. 1994) (en banc). Literally applying FAR 52.212-4(l) would involve us in a task inconsistent with our statutory charge under the CDA.

We are not, however, required to consider FAR 52.212-4(l) by itself. Given its less than ideal draftsmanship, we must consider the regulation in context and with a view to its place in the overall regulatory scheme. *See Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014). FAR 52.212-4(l) does not stand alone to guide commercial items convenience terminations. It is accompanied by FAR 12.403(d). It is that regulation that instructs the government what it is to pay commercial items contractors it has terminated for convenience. The version in effect when this contract was awarded and terminated stated the following:

> (d) *Termination for the Government's convenience.* (1) When the contracting officer terminates a contract for commercial items for the Government's convenience, the contractor shall be paid—
>
> (i) The percentage of the contract price reflecting the percentage of the work performed prior to the notice of the termination, and
>
> (ii) Any charges the contractor can demonstrate directly resulted from the termination. The contractor may demonstrate such charges using its standard record keeping system and is not required to comply with the cost accounting standards or the contract cost principles in Part 31. The Government does not have any right to audit the contractor's records solely because of the termination for convenience.
>
> (2) Generally, the parties should mutually agree upon the requirements of the termination proposal. The parties must balance the Government's need to obtain sufficient documentation to support payment to the contractor against the goal of having a simple and expeditious settlement.

FAR 12.403(d) (2006).

Thus, FAR 12.403(d) simply and unambiguously declares that, in addition to the percentage of the contract price reflecting the percentage of the work performed, a terminated commercial items contractor "shall be paid...[a]ny charges the contractor can demonstrate directly resulted from the termination." Entitlement turns objectively upon the quality of the contractor's proof, not subjectively upon the satisfaction of the government. The provision separately adds that "[t]he contractor may demonstrate such charges using its standard record keeping system and is not required to comply with the cost accounting standards or the contract cost principles in Part 31." But, it is clear that commercial items contractors are not being impaired by restrictions on how they prove their charges. They are being relieved of any through this clarification that they need not comply with the cost accounting standards or cost principles and that they *may* use their standard record keeping systems. The drafters distinguished between the mandatory "shall" in the provision's first sentence requiring payment and the permissive "may" in the second. *See United States v. Rodgers*, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion."). Confirmation that contractors may use their standard record keeping systems to demonstrate their charges does not disqualify other sources of evidence.

The regulatory history of the two provisions also confirms that there was no intent on the part of the drafters to impose any special evidentiary burdens upon commercial items contractors seeking compensation when terminated for the government's convenience. *See ATK Thiokol, Inc. v. United States*, 598 F.3d 1329, 1333 (Fed. Cir. 2010) (acknowledging the relevance of regulatory history against the backdrop of any potential ambiguity); *Marathon Oil Co. v. United States*, 374 F.3d 1123, 1139-40 (Fed. Cir. 2004) (reviewing drafting history even when not legally necessary "lest there be any lingering doubt" of a law's intent). After enactment of the Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103-355, 108 Stat. 3243 (FASA), the Federal Acquisition Regulatory (FAR) Council and FASA Implementation Manager tasked a Commercial Items Drafting Team to propose implementing FAR provisions to encourage acquisition of commercial items by the government. Memorandum from Commercial Items Drafting Team to Project Manager, Federal Acquisition Streamlining Act Implementation Project (16 Nov. 1994) (on file with the Defense Acquisition Regulations System (DARS), 1994-790-Acquisition of Commercial Items_Folder 1-LEAF-2.pdf). Among the team's goals for those rules was to "establish...policies and practices...more closely aligned to those of the commercial market place." *Id.* at 3. The team's explanation of its original draft of FAR 52.212-4 expressed the belief that its terms and conditions were consistent with customary commercial practice. *Id.* at 12. Included among those terms was a "termination" provision, both because one was needed in the event of successful protests of awards, and because the team correctly observed that termination for convenience language is common in commercial contracts. *Id.* at 13; *see, e.g., Shelter Prods., Inc. v. Steelwood Constr., Inc.*, 307 P.3d 449, 451-52 (Or. Ct. App. 2013); *Boland Managed Servs., Inc. v. Coral Chem. Co.*, No. 4-12-0563, 2013 IL App (4th) 120563-U, at *2, *10-*14 (Ill. App. Ct. Apr. 24, 2013) (Westlaw), *appeal denied*, 996

N.E.2d 10 (Ill.) (table); *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 65-69 (Tex. Ct. App. 2011); *CDC Builders, Inc. v. Riviera Almeria, LLC*, 51 So.3d 510, 511 (Fla. Dist. Ct. App. 2010); *Coppola Constr. Co. v. Hoffman Enters. Ltd. P'Ship*, No. HHDCV095034505S, 2012 WL 4040246, at *18 n.14 (Conn. Super. Ct. Aug. 16, 2012); *400 15ᵗʰ Street, LLC v. Promo-Pro, Ltd.*, No. 20651/06, 2010 WL 3529466 (N.Y. Sup. Ct. Sept. 10, 2010).

Because the team concluded that commercial contractors objected to the FAR's existing, non-commercial termination scheme, it disregarded that mechanism as a model for commercial items terminations. Instead, the "language of the termination-related provisions" of FAR 52.212-4 "was all taken, with only minor revisions, from commercial contracts." Commercial Items Drafting Team Memo at 13 (on file with the Defense Acquisition Regulations System (DARS), 1994-790-Acquisition of Commercial Items_Folder 1-LEAF-2.pdf). The resulting proposed termination for convenience clause provided the following:

> Termination. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the contractor shall be paid a reasonable termination charge considering the percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus actual direct costs that the contractor can demonstrate have resulted from the termination. The contractor shall not be paid for any work done after receipt of the termination notice, nor for any costs incurred by the contractor's suppliers or subcontractors which the contractor could reasonably have avoided.

*Id.* at 102; *see also* Federal Acquisition Regulation; Acquisition of Commercial Items, 60 Fed. Reg. 11,198, 11,215-16 (proposed 1 March 1995) (to be codified at 48 C.F.R. ch. 1). Thus, the original draft contained the two-prong requirement for reimbursement, with the second mandating "actual direct costs that the contractor can demonstrate have resulted from the termination."

Commenting on the proposed clause, the American Bar Association inquired as to how a commercial contractor was to determine the costs contemplated by it if the contractor lacked an accounting system designed to capture them. Letter from John B. Miller, Chair, Section of Public Contract Law, American Bar Association, to GSA FAR Secretariat (1 May 1995) (on file with the DARS, 1994-790-Acquisition of

Commercial Items_Folder 3-LEAF-1.pdf at 43, 45-46). Some industry commentators suggested that the draft language was inconsistent with typical commercial practice, and sought revision of the second prong to provide assurances that contractors could "calculate direct costs using their accounting systems." Letters from James H. Goldstein, Senior Counsel, Motorola, to GSA FAR Secretariat (29 Mar. 1995 and 1 May 1995) (on file with the DARS, 1994-790-Acquisition of Commercial Items_Folder 1-LEAF-4.pdf at 38, 39-40; 1994-790-Acquisition of Commercial Items_Folder 3-LEAF-1.pdf at 34, 37); letter from Rhett Dawson, President, Information Technology Industry Council, to GSA FAR Secretariat (1 May 1995) (on file with the DARS, 1994-790-Acquisition of Commercial Items_Folder 1-LEAF-4.pdf at 141, 144). Another suggestion was to permit any necessary audit review by contractor auditors. Letter from Gary N. Luethans, TotalPlant® Contract Manager, Honeywell, to GSA FAR Secretariat (17 April 1995) (on file with the DARS, 1994-790-Acquisition of Commercial Items_Folder 1-LEAF-4.pdf at 79, 80-81). However, the Defense Contract Audit Agency sought authority to audit terminated contractor records itself. Letter from Lawrence P. Uhlfelder, Assistant Director, Policy and Plans, to GSA FAR Secretariat (1 May 1995) (on file with the DARS, 1994-790-Acquisition of Commercial Items_Folder 3-LEAF-1.pdf at 20).

NASA acknowledged that formal audits are not a commercial practice. As an alternative, it initially proposed a revision to the draft's second prong, permitting "an appropriate amount that the contractor can demonstrate to the contracting officer as being reasonable for expenses resulting directly from the termination." Letter from Deidre A. Lee, Associate Administrator for Procurement, to GSA FAR Secretariat (24 Apr. 1995) (on file with the DARS, 1994-790-Acquisition of Commercial Items_Folder 1-LEAF-4.pdf at 127, 132-33). Later, NASA suggested another revision. Calling it "an editorial change," NASA proposed including the "satisfaction of the Government" and "standard record keeping system" references. The proposal said:

> Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price as reflected by the percentage of the work performed prior to the notice of termination, plus any reasonable termination charges the Contractor can demonstrate to the *satisfaction of the Government*, that resulted from the termination. The Contractor may demonstrate such charges using its *standard record keeping system* and shall not be required to comply with the cost accounting standards or the contract cost principles in Part 31.

Letter from Deidre A. Lee to GSA FAR Secretariat (19 July 1995) (on file with the DARS, 1994-790-Acquisition of Commercial Items_Folder 4-LEAF-2.pdf at 86, 90-91) (italics added).

In response to the comments, the team reiterated that the draft clause was not unique and that "[m]ore detailed termination procedures [would] be provided in Subpart 12.4." Memorandum from Commercial Items Drafting Team for Project Manager, Federal Acquisition Streamlining Act Implementation Project (5 July 1995) (on file with the DARS, 1994-790-Acquisition of Commercial Items_Folder 4-LEAF-3.pdf at 118-20). The team seems to have based the final version of FAR 12.403(d) on NASA's proposed revision of the termination provision. However, it omitted the "satisfaction of the Government" reference from FAR 12.403(d) and eventually revised FAR 52.212-4(l) to include both it and the "standard record keeping system" reference proposed by NASA.

Though somewhat convoluted, this regulatory history does not show any indication of an intent to place evidentiary restrictions upon the proof of commercial items termination for convenience claims. The commercial items termination for convenience clause was not based upon prior government convenience termination mechanisms. When NASA first proposed the "standard record keeping system" language for it, NASA merely called it an "editorial change." NASA did not propose the language out of concern that terminated commercial items contractors should face special evidentiary requirements, or suggest that the language would perform such a function. The language was adopted after concerns were expressed about how contractors could prove their costs and whether they would be able to use their own accounting systems to do so. The language permits a contractor to use its standard record keeping system to demonstrate charges in support of its claim. Nothing in the regulatory history demonstrates an intention to otherwise exclude evidence. For this reason, I respectfully disagree with the majority's interpretation of the language.

My disagreement with the majority's interpretation of what evidence is available to prove a commercial items termination claim does not mean that SWR should recover the structure costs it seeks. Even assuming SWR's testimonial evidence that it purchased the structures from FES is true, it has not proven that cost resulted from the termination and is now recoverable. The second prong of FAR 52.212-4(l)'s goal is to compensate terminated commercial contractors with "reasonable charges" to "ensure that [they] will not 'suffer as the result of a termination for convenience of the Government,' nor be forced 'to underwrite the Government's decision to terminate.'" *Red River Holdings, LLC v. United States*, 802 F. Supp. 2d 648, 661 (D. Md. 2011) (quoting *Jacobs Eng'g Grp., Inc. v. United States*, 434 F.3d 1378, 1381 (Fed. Cir. 2006)). The goal is to fairly compensate contractors by making them whole. *See Nicon, Inc. v. United States*, 331 F.3d 878, 885 (Fed. Cir. 2003). There is no reason to permit them to recover unnecessary windfalls. Where, as is the case here, the contractor seeks compensation under the clause for the cost of equipment acquired in anticipation of contract performance, it is appropriate to impose a duty to mitigate to protect against excessive recoveries. SWR concedes that, under these circumstances, both it and FES should have engaged in

69

reasonable efforts to sell the structures to mitigate their damages (app. br. at 44). Its efforts were simply not adequate.

SWR informed the government that it was purchasing the structures "at below normal market value" and says it consented to FES' $6 million quote to purchase the them after receiving the contract award from the government on 6 April (¶¶ 4, 7-8). When the government issued its stop-work order on 28 April, FES had yet to place the structures on ships to Hawaii (¶¶ 10, 11). Under the Stop-Work Order clause, SWR was required to "stop all...of the work called for by [the] contract" and "take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage" (R4, tab 4 at 46). Given this requirement, SWR should have ordered FES to suspend its shipments to Hawaii and retain the structures on the mainland. Upon the government subsequently issuing the 3 July 2006 termination for convenience, the structures should have been available on the mainland for resale in that market to cover their costs. SWR has presented no reason to conclude that reasonable resale efforts on the mainland could not have secured sufficient revenues to cover all or most of the structures' purported purchase price from three months earlier had that price been at or below the market. SWR presented no evidence of a downturn in the structures' market value between April and July of 2006.

SWR, however, did not retain the structures on the mainland. Instead, upon receipt of the stop-work order, SWR consented to FES shipping the structures to Hawaii, where SWR used some of them to perform another contract (¶¶ 11-12). Moreover, after removing the structures to Hawaii, SWR acquiesced to FES' extremely limited efforts to resell them in the isolated Hawaii market. Because FES was a Sprung contractor that would not compete with that company, FES did not openly market the structures, declining to advertise them online and limiting its sales efforts to the government, Sprung, and Classic Tents. The latter two only purchased some of the structures, and did not pay market price for them, as evidenced by Mr. McGarry's recognition that they had "lowballed" FES, and that its relationship with Sprung limited the market in which Mr. McGarry would sell the structures. (¶¶ 15-16) After these minimal efforts by FES, SWR purported to resell the remaining structures back to FES in late 2008, for a $2,792,500 credit on their purported original purchase price, under conditions that give little assurance of a true arms-length transaction.

In sum, even assuming SWR agreed to purchase the structures from FES, it did not engage in reasonable mitigation efforts after its contract was terminated for convenience. Thus, it has not shown what, if any, reasonable charges actually result from the termination. For this reason, I agree with the majority that SWR should be denied the $2,792,500 in purported debt it claims to owe FES from the purchase of the structures. However, I respectfully dissent from the majority's award of the $75,000

70

deposit that SWR originally paid to FES. SWR has not shown that amount could not also have been covered by reasonable mitigation efforts.

II.     $15,000 Lease Settlement

SWR also seeks a charge of $15,000 that was billed to it in November 2006 by Pineridge Farms, the owner of land it claims to have leased to locate the structures. It contends that it negotiated a buyout of the lease for that $15,000, which it continues to owe Pineridge Farms. Although rock was crushed and spread on the site for SWR, SWR has not produced a lease or a buyout agreement between the parties obligating it to pay anything, nor did it list Pineridge Farms as a creditor in its bankruptcy, as it did FES (¶ 23). The only potentially relevant documentary evidence it has produced is the bill. However, the bill only vaguely refers to "[r]eimbursement for services," seeking engineer fees and charges for equipment and labor (¶ 17). It says nothing about SWR and Pineridge Farms executing a lease of land or buyout. Furthermore, a mere bill is not proof that SWR is obligated to pay the amount sought. Given the absence of tangible evidence of an obligation by SWR to pay Pineridge Farms $15,000, and SWR's failure to explain why it considers itself indebted to Pineridge Farms for that amount now, when it did not recognize the alleged debt during its bankruptcy, I respectfully dissent from the majority's award of $15,000 to SWR.

III.    Profit

SWR also seeks to add to its recovery a percentage reflecting profit. Profit is expressly contemplated as part of the settlement of a fixed price non-commercial items contract terminated for convenience under the provisions of FAR Part 49. FAR 49.202, FAR 52.249-2(f). However, for commercial items contracts, the second prong of FAR 52.212-4(l) only permits recovery of "reasonable charges…result[ing] from the termination," while FAR 12.403(d)(ii) only requires payment of "charges the contractor can demonstrate directly resulted from the termination." The plain meaning of the word "charge" in this context means "price, cost, or expense." BLACK'S LAW DICTIONARY 248 (8th ed. 2004). Profit does not fall within that definition.

SWR relies upon FAR 12.403(a) to contend that we must incorporate the profit provisions of FAR Part 49 into commercial items convenience terminations. However, FAR 12.403(a) says that "the requirements of Part 49 do not apply when terminating contracts for commercial items and contracting officers shall follow the procedures in this section." Although the next sentence says that "[c]ontracting officers may continue to use Part 49 as guidance to the extent that Part 49 does not conflict with this section and the language of the termination paragraphs in 52.212-4," that authorization's use of the word "may" demonstrates that it is not mandatory. Otherwise, the prior sentence would be nonsensical. For this reason, the fact that profit has been historically recoverable under the non-commercial termination scheme contained in Part 49 is irrelevant. Furthermore, it is not enough to state that the commercial items termination

71

paragraphs do not bar profit. If SWR is entitled to profit, it must be because FAR 52.212-4(l) and 12.403(d)(ii) require it. As already noted, their plain language does not include it.

Even if there was some ambiguity in the regulations, justifying resort to their regulatory history, which there is not, nothing in their history supports the conclusion that they are intended to include profit. Again, the non-commercial termination scheme in Part 49 did not serve as the model for these regulations. Instead, the termination clause was derived from customary commercial practice and its original draft language was taken, with only minor revisions, from existing commercial contracts. Commercial Items Drafting Team Memo at 13 (16 Nov. 1994). It permitted "a reasonable termination charge considering the percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus actual direct costs that the contractor can demonstrate have resulted from the termination." *Id.* at 102; *see also* 60 Fed. Reg. at 11,215-16. Thus, the second prong was limited to "direct costs" only and did not hint at profit. Although subsequent revisions replaced "costs" with "charges," there is no indication of any intention to permit profit.

At bottom, nothing in the plain language of these regulations, or in their drafting history, supports an award of profit to SWR. The FAR drafters expressly provide for profit in Part 49's non-commercial termination scheme, demonstrating that they know how to impose that requirement when they wish to do so. *See Whitfield v. United States*, 543 U.S. 209, 216 (2005) ("Congress has included an express overt-act requirement in at least 22 other current conspiracy statutes, clearly demonstrating that it knows how to impose such a requirement when it wishes to do so."); *Meghrig v. KFC Western Inc.*, 516 U.S. 479, 485 (1996) (Congress showed in CERCLA that it knows how to provide for cleanup costs, and RCRA does not provide that remedy.). This Board should not be overriding the FAR drafters' choice to exclude it here. For these reasons, I respectfully dissent from the majority's award of profit.


MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals


72

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 56708, Appeal of SWR, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals